# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 4, 2008 Session

# PERRY ANTHONY CRIBBS v.  STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No.  P-20670          Carolyn Blackett, Judge**

---

**No. W2006-01381-CCA-R3-PD  - Filed July 1, 2009**

---

The petitioner, Perry Anthony Cribbs, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions for first degree felony murder, attempted first degree murder, and aggravated burglary, and resulting sentences of death, forty years, and ten years, respectively.   On appeal, the petitioner presents a number of claims that can be characterized in the following categories:   (1) he is actually innocent of murder; (2) he was denied a fair post-conviction evidentiary hearing; (3) the post-conviction court's failure to conclude that he was mentally retarded was contrary to the proof presented by the psychological experts; (4) he was denied the effective assistance of counsel at trial and on direct appeal; and (5) Tennessee's death penalty statute violates the United States and Tennessee Constitutions. Following a thorough and exhaustive review of the record and the applicable law, we conclude that the petitioner received the ineffective assistance of counsel at sentencing.   Therefore, the petitioner's death sentence is reversed, and the case is remanded to the trial court for a new capital sentencing hearing.   The judge who presided over this post-conviction proceeding is disqualified from any subsequent proceedings in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. Kelly Thomas, Jr., J., joined.  THOMAS T. WOODALL, J., filed a dissenting opinion.

Paul J. Morrow, Jr., and Sara Willingham, Nashville, Tennessee, for the appellant, Perry Anthony Cribbs.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

### A. Proof Underlying the Petitioner's Convictions

In the petitioner's direct appeal, our supreme court stated the following facts:

The proof presented by the State at the guilt phase of the trial established that sometime between 1:30 a.m. and 1:45 a.m. on the morning of January 2, 1994, the victims, Sidney Harris, and his wife, Linda Harris, returned from a visit with friends to their home located at 4378 Cottonwood, in Memphis. As was his habit, Sidney Harris backed his car onto the carport, and then opened the door for his wife to enter the house. As she came through the kitchen door, Linda Harris was attacked and knocked to the floor by an unknown assailant. Sidney Harris struggled with this man, who was armed with a pistol, for approximately fifteen seconds, and had wrestled him to the floor when a second assailant, armed with a double barrel sawed-off shotgun, intervened and ordered Harris to release the first man.

With guns leveled upon him, the two intruders ordered Harris to sit in a chair located in the den of his home, which was just off the kitchen, about five feet from where his wife was located. At some point, the intruders asked Harris, "where is the dope?" and they told Harris they intended to shoot him. Though the lights were not on in the house during this time, Harris said the carport light shone through the open kitchen door and provided sufficient illumination for him to observe the facial features of the intruders. Harris observed the assailants for twenty to thirty seconds before the second assailant fired the shotgun, striking Harris in the left shoulder and hand. Harris lost consciousness for a time after he was shot. When he regained consciousness, the assailants were gone. Harris observed his wife's body lying in a pool of blood on the floor of the kitchen where she had been initially assaulted. Based upon the discovery of wadding material on the left side of her neck and powder burns on her body, the medical examiner testified that Linda Harris had sustained a contact shotgun wound to the left side of her head which would have resulted in instantaneous death. Harris made his way to a neighbor's house, where he was able to summon assistance before again losing consciousness.

When the police arrived at the scene they found the house in disarray. The intruders apparently had gained entry to the house through an open bedroom window. Toys belonging to the victim's daughter were in that bedroom and visible on the videotape of the scene made by police. The videotape also showed the body of Linda Harris in the kitchen, shotgun shells on the den floor, and bloodstains on the chair in which Sidney Harris had been sitting when he had been shot. There were several bullet holes in the wall to the left of the chair in the den.

Officer Donald Crow, a Memphis policeman, rode with Harris as he was transported to the hospital shortly after the shooting. Officer Crow testified that Harris described the first assailant in some detail, but stated that the man had been wearing a black ski mask. With respect to the second assailant, Harris, according to Officer Crow, said only that he was tall, thin, and wore a black ski mask. Sergeant Ronnie McWilliams of the Memphis police directed the investigation and interviewed Harris the day after the shooting. At that time, Harris said that he could not identify either of the two suspects because they had been wearing black ski masks. About a week later, Harris told a police officer that he could not get the complexion of the man with the shotgun. Sergeant McWilliams described Harris as being heavily sedated on the day after the murder and said that he had been in serious condition when the second statement had been taken. Harris could not remember speaking to police on the night of the murder and recalled being sedated when he spoke with police the next day. Thereafter, and at trial, Harris described the first assailant as a black man, wearing a light-colored sheer stocking mask, a denim jumpsuit, and gloves, approximately 6'1" in height, 240 pounds in weight, with a moustache, large round nose, thick eyebrows, and hair about one inch in length. Harris said the second assailant, who had shot him, also had been a black man, wearing a light-colored sheer stocking mask, a dirty light green or gold mechanic's jumpsuit and gloves. Harris said this man was taller and thinner than the first assailant, approximately 6'3" or 6'4" in height, and about 220 pounds in weight.

At the time of this murder, the defendant was residing with Jacqueline Cannon, the mother of his daughter. Cannon stated that on the night of the murder, the defendant, wearing blue jeans and a blue denim shirt, left their residence at approximately 9:00 or 10:00 p.m. When he returned sometime around 1:00 a.m., Cannon

-3-

said he was covered in blood from a "hit." Cribbs told her that he had shot a man and a woman. Cribbs explained that he had been hired to kill the man by another man who had been having an affair with the female victim. Cribbs said that he had killed both victims and claimed that he would be paid for the "hit" soon. The next day, Cannon discovered at her residence a gold-faced Mickey Mouse watch with a leather wrist band with the words "genuine leather" imprinted on the back. When she asked Cribbs about the watch, he explained that he had taken it from the home of the couple he had killed.

Shortly thereafter, Cannon learned from news reports that a man and woman had been shot, as Cribbs claimed, on the night of January 2, 1994. The woman had been killed but the man survived the shooting. Because she feared Cribbs, Cannon did not relay her knowledge about the murder to the police at that time. Some four to six weeks later, however, Cribbs became angry with Cannon because he suspected she had told a neighbor about his role in the murder. Cribbs assaulted and beat Cannon, and she was hospitalized for three days, suffering, among other things, a punctured lung. Fearing for her life, Cannon related to her brother what Cribbs had told her about the murder. Her brother notified Crime Stoppers, and as a result, the police located and interviewed Cannon. Cannon eventually received $900 from Crime Stoppers, and her brother received $100.

Upon learning of the gold-faced Mickey Mouse watch from Cannon, police asked Sidney Harris if his wife had owned such a watch. Harris had been hospitalized for twenty-two days following the shooting and had not discovered the watch missing. When questioned by police, Harris confirmed that his wife had owned such a watch and that it had been among the items missing from the house after the murder. At this point, having reason to believe that the defendant may have been involved in the murder of Linda Harris, police compiled a photographic lineup of eight men, including the defendant, who matched the description given by Harris. Visibly shaken and emotional, Harris identified the photograph of Cribbs as "the mother ----- that shot me!" Harris previously had viewed two other photographic lineups, but had not identified anyone as the person who shot him and killed his wife. At trial, Harris also positively identified Cribbs as the man who shot him.

Based upon the proof summarized above, the jury found the defendant guilty of premeditated first degree [murder]; first degree murder during the perpetration of an aggravated burglary; and first degree murder during the perpetration of aggravated robbery.[1] The defendant was also found guilty of aggravated burglary and attempted first degree murder.

The trial proceeded to the sentencing phase. The State relied upon the evidence presented during the guilt phase of the trial, and in addition, introduced proof to show that the defendant, twenty-three-years-old at the time of trial, previously had been convicted of two counts of attempted second degree murder and one count of aggravated robbery in 1990. Also introduced was testimony that the defendant had been convicted of attempted second degree burglary in 1989.

Testifying on his own behalf, Cribbs said that he had been born in Alabama, but had lived in Shelby County for about nine years. The defendant's mother, grandfather, and two brothers, twenty-six and seventeen, resided in Armory, Mississippi at the time of the trial. Because of his grandfather's illness and obligations at work or school, none of his family were able to attend his trial. Cribbs said that his family had visited him on the Sunday prior to trial, and that visit had been the first time he had seen his mother in four years. Cribbs had a cousin in Memphis and previously had been employed by his uncle's construction company, but none of his family members attended the trial or testified on his behalf. Cribbs said that he had told his aunt that the trial was a matter of life or death, but he had not pressed his mother to attend the trial because she had been ill, and he did not want to worry her. Cribbs said that he had attended school through the seventh grade but had dropped out when he was expelled for truancy. Of the twelve-year sentence he received on the convictions for attempted second degree murder and robbery, Cribbs had been incarcerated for three and one-half years in prison and had not violated prison rules during that time. Cribbs said that he had visited with his only child, a daughter, seven or eight times

---

[1]At the petitioner's motion for new trial hearing, the trial court set aside the convictions for first degree premeditated murder and first degree murder during the perpetration of aggravated robbery but upheld the conviction for first degree murder during the perpetration of aggravated burglary and the death sentence. See State v. Cribbs, 967 S.W.2d 773, 776 (Tenn. 1998).

since being arrested for the murder of Linda Harris. Cribbs denied committing the crime for which the jury had convicted him, and he said that he had refused to plead guilty in exchange for a life sentence because he had not committed the crime. Cribbs explained that Cannon had falsely implicated him in the murder because she was angry. Cribbs said that he had argued with Cannon because "she stole some money from me. I had whooped her real bad and told her I wasn't going to come around no more. . . . So she came in and said this on me." Cribbs denied having any knowledge of a gold-faced Mickey Mouse watch. Lastly, Cribbs asked the jury to spare his life, saying that he would conduct himself as a decent individual in prison if given a sentence of life imprisonment without the possibility of parole.

Based upon the proof, the jury found that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, a burglary." Tenn. Code Ann. § 39-13-204(i)(2) and (7) (1991 Repl.). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

State v. Cribbs, 967 S.W.2d 773, 776-79 (Tenn. 1998) (footnotes omitted), cert. denied, 525 U.S. 932, 119 S. Ct. 343 (1998).

For the attempted first degree murder and aggravated burglary convictions, the trial court imposed consecutive, Range II sentences of forty and ten years, respectively. Our supreme court affirmed the petitioner's convictions and sentences. Id. at 776 n.1. On December 2, 1998, the petitioner filed a pro se petition for post-conviction relief. On February 8, 1999, the trial court appointed the Office of the Post-Conviction Defender to represent the petitioner in the proceedings, and counsel filed an amended petition on April 13, 2000. Evidentiary hearings on the petition were conducted on various dates in November 2001, April 2002, June 2002, and September 2002.

B. Proof at the Post-Conviction Evidentiary Hearings

Betty Thomas-Moore, an assistant public defender, testified that she became co-counsel after September 16, 1994, and "was not a part of any of the motions or the hearings" in the case. Despite a request for discovery, co-counsel denied ever viewing James Irvin Parker's statement

anytime in 1994. In his February 12, 1994 statement, Parker had claimed that he was incarcerated with "several persons who bragged to him that they were the ones who killed Linda Harris and shot her husband, Sidney. . . [and] also indicated that they killed her and shot her husband as a part of a plan with the husband, Sidney Harris, to kill the wife, Linda Harris." Co-counsel opined that the statement would have been material to the preparation of the petitioner's defense. She explained that, had she been in possession of the statement, she would have located Parker and investigated the statement's validity. Although co-counsel could not recall the indictment, she was not surprised to learn that Parker's name was listed on it. She explained that normal procedure would have been to take the witness names from the indictment and try to locate each one. Nothing in the attorney file indicated anyone attempted to locate Parker.

Co-counsel testified that Sidney Harris allegedly was involved in his wife's shooting. She described the allegation as "a rumor that Mr. Harris had put a contract out on his wife." Co-counsel said she unaware of any marital problems the Harrises were having, and she was unaware of any extramarital affairs or financial problems. Co-counsel stated that no investigation was conducted into Sidney's[2] possible involvement with drugs. Although defense counsel had heard several allegations regarding Sidney's involvement with drugs, their investigation into the case failed to substantiate the allegations. The defense's investigator, Ralph Nally, would have been assigned to investigate the allegations.

Regarding the petitioner's former girlfriend, Jackie Cannon, co-counsel could not remember any investigation. Cannon told police that the petitioner came home the night of the shooting with blood on him and that he gave her a Mickey Mouse watch that supposedly belonged to one of the victims. The attorney file reflected that Ralph Nally interviewed Cannon on September 8, 1994. Co-counsel could not recall interviewing Cannon's brother, George Ross. She qualified her statement by explaining that she did not do much investigating on her own in the case. Co-counsel also could not explain why there was no cross-examination of Cannon at trial in response to Cannon's statement that she and her brother received money from Crime Stoppers. Co-counsel did not remember whether she and lead counsel had discussed Cannon's cross-examination.

Co-counsel testified that Elizabeth Benson was supposed to gather background information about clients. This entailed gathering information about schoolwork, medical problems, medical history, family history, work history, and anything else related to a client's life. Co-counsel related that Benson had reported in her working document that the petitioner was in a resource class. Co-counsel interpreted a "resource class" to be a class for those persons "who were a little bit slower than everybody else so they were in special ed. classes."

Co-counsel testified that the defense did not consider filing a motion for the trial judge, Judge Axley, to recuse himself based upon his "perceived attitudes towards death penalty

---

[2]Because the victims have the same surname and some of the witnesses share the same surname, we have chosen to utilize their first names when necessary for clarity. We mean no disrespect to these individuals.

defendants." She stated that she did not conduct any mitigation investigation on her own or go to Alabama where members of the petitioner's family lived. She did not remember seeing anything in the file directing Ralph Nally to go to Mississippi or Alabama. Co-counsel stated that she may have talked directly with members of the Cribbs family, but she was not certain.

Co-counsel testified that she could not recall seeing a Tennessee Department of Correction report regarding the petitioner's prior offenses. However, upon review, she stated that the report was in the attorney file. The report contained a list of family members, specifically Loretta Cribbs, Marie Cribbs, Randy Cribbs, Annie W. Cribbs, Vonzell Cribbs, Freddie Cribbs, Oday Cribbs, and Jackie Cannon. They lived in Memphis, Tennessee, and Amory, Mississippi. Co-counsel never contacted any of the petitioner's friends or school teachers, and she could not remember anything about the victim's family or the petitioner's family. She also could not recall anything about the petitioner's parents or his birth records, school records, juvenile records, or Sunday school records.

Co-counsel testified that although a competency and sanity examination was completed on the petitioner at the Midtown Mental Health Center, she could not recall any requests for further expert assistance in that area. Co-counsel added that, in her opinion, "lots of stuff . . . is missing from the file." Specifically, co-counsel stated that documents she obtained during the trial were missing. As for the theory of the case, co-counsel could not remember the specific defense theory. She stated that the petitioner "always has said that he didn't know anything about it and didn't know . . . Ms. Harris nor Mr. Harris." Co-counsel also could not remember the defense strategy at sentencing. However, she recollected that the petitioner was the only witness who testified at sentencing.

On cross-examination, co-counsel reiterated that she became involved in the case late and acted primarily as second chair. She testified that at the time of her appointment, the case already had been prepared for trial. The capital defense team had a social worker, Elizabeth Benson, who would have compiled a background history on the petitioner. Although co-counsel did not talk with the petitioner's family members, another member of the defense team may have talked with them.

Regarding the trial, co-counsel testified that she "did not do any direct examination of any witness" and did not cross-examine any witnesses. She added that she did not assist with any trial preparation with the exception of her own personal preparation, which consisted of reading the file. Co-counsel stated that although her involvement was limited, she talked with the petitioner, and she recalled "there not being somebody available to testify on his behalf." She added that "for some reason . . . we couldn't get his family to come down for the mitigation." She said that if any of the petitioner's family members had wanted to testify, the defense team would have made sure they had transportation to and from court.

Co-counsel testified that nothing indicated the petitioner did not understand the nature of the charges against him, the legal proceedings, or the law and evidence against him. The

petitioner also did not indicate he was having any emotional or mental problems at the time. Co-counsel stated that if she had noticed any mental problem, she would not have ignored it. Co-counsel characterized lead counsel as very thorough in the handling of cases and very intense.

Ronald Johnson, lead counsel at trial, testified that prior to the petitioner's case, he had tried three to four, but no more than five, capital cases. He explained that lead counsel in a capital case actually prepared the case for trial. He related that he initially was second chair in the petitioner's case but became lead counsel when attorney Ed Thompson was no longer involved with the case.

Lead counsel stated that he had information in the form of a statement from James Irvin Parker indicating that Parker heard three men say Sidney Harris hired them to kill Linda Harris. Lead counsel characterized the statement as exculpatory and said he obtained the statement prior to trial. He recalled asking the investigator to locate Parker. However, the investigator was unable to find him. Lead counsel stated that no one on the defense team talked with the law enforcement officers who took Parker's statement. Lead counsel affirmed that his standard practice was to contact every person identified as a witness on the indictment.

Lead counsel testified that Elizabeth Benson, the mitigation investigator/social worker, had indicated on her intake form that the petitioner had some type of learning disability. Despite the reference, no investigation into the petitioner's I.Q. occurred. Instead, the investigation was limited to an evaluation by the Midtown Mental Health Center. Lead counsel recalled attorney Ed Thompson discussing, at one time, the question of retaining mental health experts for the petitioner. However, in Thompson's opinion, they were not needed. Lead counsel stated that although no records from the Memphis City Schools were in the attorney file, there was an indication such records were requested but never received.

Lead counsel testified that the defense team did not discuss filing a motion for Judge Axley to recuse himself and that lead counsel did not seek any assistance from the Southern Center for Human Rights, Legal Defense Fund. However, lead counsel used the Tennessee Association of Criminal Defense Lawyers Tools for the Ultimate Trial, Tennessee Death Penalty Defense Manual. Lead counsel stated that he did not know any of the jurors personally and that he was familiar with legal precedents relating to questioning and challenging potential jurors.

Lead counsel testified that he did not talk with any of the petitioner's family members, and he did not recall any member of the defense team going to Mississippi or Alabama to speak with them. However, the defense team interviewed family members who lived in Memphis. Lead counsel related that, just prior to trial, the petitioner's uncle, Charlie Cribbs, told the defense team not to call them anymore. He added that no one on the defense team contacted any of the petitioner's friends or teachers. The petitioner's mother was ill at the time of trial, and nothing in the attorney file reflected that the defense team obtained the petitioner's birth records.

Lead counsel testified that he did not know anything about Linda Harris' family, and he did not know if any member of the defense team attempted to interview her family. He recalled that Sidney Harris and perhaps his brother were interviewed. Sidney's brother indicated that Sidney may not have been completely truthful. Lead counsel stated that it was common knowledge Sidney "had a girlfriend or two." He could not recall if any investigation into Sidney's extramarital affairs was attempted, and he was not aware of any financial or drug problems involving the Harrises.

Regarding Jackie Cannon, lead counsel testified that she had a child with the petitioner. The defense team had a difficult time locating Cannon, and lead counsel believed she was "possibly on drugs." He also was aware that the petitioner had harmed Cannon during a physical altercation. Lead counsel was unable to explain why the defense did not cross-examine Cannon about her drug use or the amount of money she received for "turning in" the petitioner. The petitioner claimed he was not the perpetrator. Accordingly, the defense theory was that the petitioner was innocent.

On cross-examination, lead counsel testified that he and the petitioner met on numerous occasions. He thought they had a very good attorney/client relationship. Lead counsel thought Sidney Harris' identification of the petitioner was questionable. He unsuccessfully attacked the identification in the motion to suppress and attempted to discredit the identification at trial. Although lead counsel asked the petitioner for names of individuals who could help with his claim of innocence, the petitioner was not forthcoming with any names.

Lead counsel testified that Dr. Wyatt Nichols from the Midtown Mental Health Center signed a letter stating that "there was no sign that he was incompetent or they couldn't support an insanity defense." Lead counsel related that from his discussion with Dr. Nichols, "[t]here was no indication that . . . [the petitioner's] I.Q. was impaired." Lead counsel never had a problem carrying on a conversation with the petitioner, and the petitioner understood the legal process, the crime he was charged with, the facts against him, and the law establishing punishment. Lead counsel stated that the petitioner was adamant about not being guilty and that the petitioner understood the charges and "the consequences." Lead counsel stated that if he had had any concerns about the petitioner's ability to understand, he would have had further evaluations performed.

Lead counsel testified that no information gathered supported James Parker's statement that Sidney Harris ordered his wife to be killed. Considering the injuries sustained by Sidney, lead counsel thought a defense strategy suggesting that Sidney played a substantial role in the crime was questionable.

As for mitigation, lead counsel testified that he asked the petitioner for possible witnesses, to which the petitioner responded, "I don't know anyone. I have no friends." The petitioner offered no other information about himself that would have helped the defense compile mitigation proof. As for other mitigating factors, lead counsel conceded that the defense did not

ask for any of the statutory mitigating circumstances.  He noted that the petitioner had just been released on parole for an attempted murder conviction.  Lead counsel stated that the petitioner declared his innocence and asked the jury to spare his life.  The petitioner's family was not helpful in preparing a mitigation defense.

Mae Donald, Linda Harris' mother, testified that Sidney Harris informed her while he was in the hospital that "they won't never get them two men . . . unless they turn themselves in."  Sidney explained to her that "if they walked in my room right now I couldn't identify either one of them."  As a result, Donald questioned Sidney's identification of the perpetrators and told law enforcement officers she did not believe the petitioner was the perpetrator.  Donald said Linda had borrowed money from her.  She stated that no member of the defense team contacted her and that she would have talked with them.

Alex Warren, Linda Harris' brother-in-law, testified that he spoke with Sidney Harris while Sidney was hospitalized.  Sidney told Alex that he wrestled with one of the intruders on the floor.  The only thing taken from the home was a Mickey Mouse watch.  Alex said he had seen a 16-gauge, single-shot shotgun in a closet in the Harrises' home and that Linda Harris had told him the gun belonged to Sidney's father.

Sara Warren, Linda Harris' sister, testified that in 1993, Sidney Harris was unemployed, and Linda was employed at the Veterans Administration Hospital.  Sara was unaware of any financial or marital problems in the Harrises' marriage.  She said that the week before Linda's death, Linda changed her insurance.  Sara also said she received a strange letter from her sister about one month prior to her death, and Sara described the letter as a "good-bye" letter.  Sara visited Sidney in the hospital after the offenses and thought it was odd that he had received red roses from women.  She also stated that there were a lot of people just sitting around in his room.  The defense never contacted Sara.

Cheryl Banks, Linda Harris' college friend, testified that she served as maid of honor at Linda and Sidney Harris' wedding.  Banks said that during the wedding ceremony, Sidney told Linda, "I guess you're satisfied now."  Banks knew about Sidney's marital infidelity, and Linda frequently borrowed money from her.

James Parker testified that in 1994, he lived in Memphis and talked with Memphis police regarding Linda Harris' homicide.  Parker testified that he told the police that

> [he] was over some friend's house named John Lee Brownlee and Bo.  And we was over their house drinking, sitting around and stuff.  And some people came in.  And they was talking about some drugs . . . and some murder.  They talking about . . . they wanted some murder for hire . . . .  It was all . . . about some drugs and stuff.

One of the men said that he owed "D.D. some money" for "some drugs." Parker identified the man as Sidney Harris. "D.D." was identified as a female drug dealer who conducted business mostly on the south side of Memphis. Parker explained that "[t]he contract was set up in John Brownlee house." D.D. talked to the men about making some money and explained that it would be a murder-for-hire. The first installment was to be $2500. Parker stated that he did not see the money. Parker said that "Angelo," "Little Rob," and "Amos" later talked about how they should have killed the man instead of just wounding him. Parker identified Sidney Harris as the man who asked D.D. about killing his wife.

Troy Joyner, Sidney Harris' former neighbor, testified that in 1994, he visited Sidney at his home on a daily basis. Joyner said Sidney had asked Joyner to purchase cocaine for him.

Sergeant Ronnie McWilliams testified that he was assigned to the Memphis Police Department's homicide unit in 1994 and was the lead detective for Linda Harris' homicide. He said that the investigation did not implicate Sidney and that the police never investigated Sidney as a suspect.

Sergeant McWilliams testified that he never spoke to James Parker. However, Parker had mentioned the names of "Amos, Angelo and Little Rob." Sergeant McWilliams stated that the homicide file contained a statement from a person known as Little Rob. Parker gave a statement on February 12, and the police arrested the petitioner on February 14. Sergeant McWilliams denied being aware that Jackie Cannon was using crack cocaine or that Cannon's brother, George Ross, also was using crack cocaine.

On cross-examination, Sergeant McWilliams testified that he first became aware of the petitioner's name from a Crime Stoppers tip and that George Ross called in the tip about January 29. Sergeant McWilliams did not talk with Jackie Cannon until February 8. He explained that Cannon was in the hospital, and then she moved. He said Cannon was very scared and was the first person to mention the Mickey Mouse watch. Sergeant McWilliams asked Sidney Harris whether any watches were missing, and Harris said a Mickey Mouse watch was missing.

Regarding James Parker's statement, Sergeant McWilliams testified that he was unable to gather any information to corroborate Parker's claim that the murder was committed by Angelo, Amos, and Little Rob. Sergeant McWilliams stated that the police conducted an investigation regarding Sidney Harris' involvement but that no motive was found. Sidney had been wounded in the incident, suffering wounds to his face and neck and losing three fingers. Sergeant McWilliams did not believe Parker's claim that Sidney was wounded to cover up his involvement, and Sergeant McWilliams could not find any credible evidence that someone other than the petitioner killed Linda Harris.

Stephanie Kendricks testified that Linda Harris was her best friend. Kendricks stated that Sidney Harris was never faithful to his wife and that Linda was aware of her husband's infidelities. Kendricks said Linda had a lot of financial problems and also had marital problems.

-12-

Kendricks recalled that after Linda's murder, Sidney's sister commented, "I hope Sidney didn't have anything to do with this." Prior to her murder, Linda told Kendricks that if something happened to her, her child would live with Sidney and then go to Little Rock.

Betty Cribbs, the petitioner's aunt, testified that the petitioner's mother, Marie, was a nervous person, sweet in her own way, and good. Marie Cribbs never attended school, was unable to read and write, and took care of her fourteen siblings. Before Marie moved to Memphis, she lived in Vernon, Alabama. The house in Alabama was "just a two room – kitchen with two rooms and shack really . . . [w]ith an outside toilet." Betty estimated that approximately ten people lived in the house.

Betty Cribbs testified that the petitioner was born in 1971 and that she had known him since he was nine years old. She said that in 1981, Marie left the petitioner in Alabama with her sister and moved to Memphis. Marie took two of her children to Memphis, fifteen-year-old Randy and five-year-old Joseph. Marie lived with Betty for about a year. Betty and her husband, Charlie, expressed concern because they found Randy and Joseph in bed with Marie even though they had their own beds. Marie did everything for the boys, and Betty could not recall the boys misbehaving. She thought it was peculiar that she could not recall ever seeing the petitioner eat. Marie told her that the petitioner did not like food and that "he eat junk."

Betty Cribbs testified that at some point, she helped Marie get her own apartment. She also helped Marie get assistance from the Aid to Families with Dependent Children (AFDC) program and food stamps. Marie could not do anything for herself and was dependent financially on Betty and Charlie Cribbs. When the petitioner moved to Memphis, he should have been in the eighth grade, but because he was so far behind, he was placed in the fifth grade. She said that "[f]or his age, he should have been below the fifth grade. He should have been up, you know, where an eight year old should be. But he was about ten when they put him back to the 5th grade. They said that was as far as they could put him back." Betty Cribbs said the petitioner's grandfather, Dan Cribbs, was in a nursing home in Bastrop, Louisiana; suffered from Alzheimer's disease and diabetes; and had been diagnosed as paranoid schizophrenic.

Betty Cribbs testified that at the time of the petitioner's trial, Marie lived in Mississippi. Betty stated that the defense never contacted her. However, she also said she received a telephone call one morning from a woman who said that "they needed the family down here because he was fixing to be sentenced." Betty said she did not go to court because "everything would have been over" by the time she arrived. She then qualified that statement by saying that she was not wanted at the trial and that only the petitioner's uncles were asked to come to court.

Charlie Cribbs, Betty Cribbs' husband and the petitioner's uncle, testified that he was a self-employed contractor. He was born in Vernon, Alabama, and the petitioner's mother was his sister. Charlie was one of fifteen children and was the fourth oldest. The petitioner's mother was the fifth oldest. He described their childhood home as a "shack . . . plank house" and said

his parents were sharecroppers. Charlie's mother was either sick or pregnant for most of his childhood, and she was diabetic. Three of his siblings also had diabetes.

Charlie Cribbs testified that his sister, Marie, was a very nervous person, was unable to read or write, was sick for a very long time, and almost lost her eyesight. Marie was unable to discipline her children and could barely take care of herself. Charlie helped his sister financially.

Charlie Cribbs testified that he moved from Alabama to Memphis, Tennessee, in 1960. Marie moved to Memphis in 1967 but got pregnant by Dockery Moore and moved back to Alabama. The petitioner was born in Alabama but moved to Memphis when he was thirteen years old. Charlie said the petitioner had a difficult time doing tasks assigned to him, but Charlie did not attribute the difficulty to laziness.

Regarding the petitioner's trial, Charlie Cribbs testified that the defense never contacted him. He saw information about the petitioner's case on the news. On one occasion, his wife told him that "his mother had called or something or other," but he was unable to go to court.

Pamela Woods, the petitioner's aunt, testified that she lived in Amory, Mississippi, and was the youngest of her siblings. She was nine years old and lived in her parents' Vernon, Alabama home when the petitioner was born. When the petitioner was four or five months old, Marie Cribbs moved to Memphis, and their sister, Loretta, took care of the petitioner. Pamela Woods recalled that the petitioner ate "paint and some sponge rollers" when he was a toddler, and she described his eating habits as "strange." She said the petitioner was not a good student.

Pamela Woods testified that Will Jones was the petitioner's father and that he was not around much when the petitioner was a child. Jones had a wife and some other children. Marie Cribbs was sick during her pregnancy with the petitioner. Pamela said she had heard of some "sexually inappropriate behavior between Loretta [Cribbs] and [the petitioner]."

Loretta Cribbs, the petitioner's aunt, testified that she lived in Amory, Mississippi. She described herself as a "second mother" to the petitioner when he was young. The petitioner's mother, Marie, was sick during her pregnancy, having thyroid problems. When the petitioner was two years old, he was in a car accident in Sulligent, Alabama. Loretta was driving the car, Marie was in the front passenger seat, and the petitioner was sitting on Marie's lap. Loretta's head struck the windshield, Marie's head went through the windshield, and the petitioner was thrown out of the car. The petitioner was hospitalized for twenty-four hours, and the doctors said he suffered head injuries. The petitioner was in special education classes from the first grade through the fourth grade. He had chicken pox, measles, mumps, and other normal childhood diseases.

Loretta Cribbs testified that the petitioner's father was married and drank alcohol. The petitioner knew his father's identity, but his father had no role in his life. The petitioner was a follower, not a leader, and was easily influenced by others. Loretta described his bizarre eating

-14-

habits, recalling an incident when he gnawed her hair rollers. When the family moved to Memphis, they lived in rough neighborhoods and public housing where the petitioner witnessed shootings. Loretta said that the defense never contacted her before the trial and that she would have testified if asked.

On cross-examination, Loretta Cribbs testified that she took care of the petitioner from about birth to age nine. She said she took care of him as best as she could, and she denied that anything sexual occurred between them. She said she never beat or sexually abused the petitioner.

Randy Cribbs, the petitioner's older brother, testified that he grew up in Memphis but spent some time in Vernon, Alabama. He said he dropped out of school in the ninth grade and started helping his uncle in his construction business. At that time, he was living with his mother and helping her financially. He described his mother's health as "stable" and "pretty good," although she was diabetic. When the petitioner was nine or ten years old, the petitioner moved to Memphis. The family lived in apartments in Whitehaven, and Randy described the neighborhood as having "[a] lot of shootings. A lot of fights." The petitioner met Jackie Cannon when he was about seventeen years old. Cannon smoked crack cocaine, and her brother, George Ross, was a "crackhead." Randy saw them use drugs, and drug use was common in their neighborhood.

Randy Cribbs testified that in November 1993, the petitioner was paroled from prison. Jackie Cannon tried to borrow money from Randy, but he refused because he thought she would use it for crack cocaine. Cannon used her child with the petitioner as an alibi, and Randy thought Cannon was worried the petitioner was going to try to gain custody of their daughter when he got out of prison. In 2000, Cannon contacted Randy and wanted to speak with Marie Cribbs. Cannon informed them that her daughter had been raped, and Randy told her to contact the police. The defense never contacted Randy, and he would have testified on his brother's behalf.

On cross-examination, Randy Cribbs testified that he had two brothers, including the petitioner. The petitioner's other brother, Joseph, was incarcerated, and Randy was employed at Kia Super Store in Tupelo, Mississippi.

Dr. Jonathan Pincus, a professor of neurology at Georgetown University and the Chief of Neurology at the Washington Veteran's Administration Medical Center, testified that his area of expertise was in adult and child neurology and that he had a specific interest in the neurology of behavior, especially violent behavior and movement disorders. Dr. Pincus met the petitioner in December 2001. In preparation for his meeting with the petitioner, Dr. Pincus reviewed numerous documents, including a psychological assessment conducted by Dr. Tom Pendergrass, the petitioner's school records, the petitioner's mental health records from the Memphis City Schools, the petitioner's juvenile court records, evaluations of the petitioner completed by the Midtown Mental Health Center, and a psychological assessment completed by Dr. Geraldine

Bishop.  Dr. Pincus also had access to a report prepared by Dr. Pamela Auble, a neuropsychologist.

Dr. Pincus testified that he ordered an MRI for the petitioner.  From the February 2002 MRI, Dr. Pincus observed that the brain was abnormal, stating that "it was shrunken, atrophic, especially in the parietal regions."  Dr. Pincus explained that the parietal region of the brain controlled the capacity to read, write, calculate, and speak.  He also explained that slight atrophy was to be expected when a person reached their seventies or eighties.  However, it was very abnormal for atrophy to occur in a younger person.  Dr. Pincus stated that, although abnormal, he could not determine from an MRI when the abnormality occurred.  He said it could have occurred in utero or could have resulted from a later incident.  He also opined that it could have resulted from a degenerative disease.

Dr. Pincus testified that he was not certain as to what effect this atrophy would have on a person's neurological functioning.  He explained that a determination would require "careful psychological testing sometimes, a careful neurological examination in order to determine what the concomitance of that are."  Dr. Pincus opined that, in this case, "I think they underlie the . . . neuropsychological deficits that have been found and the neurological abnormalities that I found."  He stated that EEG results revealed nothing and that an EEG was not always a good test because people suffering from strokes or Alzheimer's disease could have normal EEG results.

Dr. Pincus testified that he conducted an examination on the petitioner that was heavily weighted toward discovering how the frontal lobes of the brain were working.  In the examination, Dr. Pincus used motor and sensory testing.  In an eye movement test, Dr. Pincus determined that the petitioner's "frontal lobes weren't up to it"; his eyes moved "in little staccato jerks instead of . . . as smooth visual pursuit which would be normal."  Dr. Pincus explained that speaking required a tremendous amount of coordination.  According to the petitioner's history, someone had reported that the petitioner had problems enunciating properly.  Dr. Pincus also found "hyperreflexia."  Dr. Pincus explained that "hyperreflexia" meant the petitioner's reflexes were a little too active, which could have been the result of brain damage or could have been a neurological deficit.  Dr. Pincus discovered that the petitioner was unable to relax his legs, which was abnormal and a sign of frontal dysfunction.

Dr. Pincus testified that he administered the Luria two-step pattern and three-step pattern movements to the petitioner.  The test required the patient to have one hand open on the thigh and the other hand held in a fist on the thigh.  The patient was then asked to tap to ensure he or she could do so.  Then the patient was asked to reverse the scenario so that the open hand became a fist, and the fisted hand was open.  The patient was asked to tap again.  Dr. Pincus stated that the petitioner was unable to complete the task because he was unable to alternate.  Dr. Pincus also administered the "hand grasp test."  For the test, the patient was asked to extend his arms. A finger was placed on the palm of one hand, and another finger was placed on the palm of the other hand.  The patient was then asked to relax, and the hands should have gone loose.  The petitioner's response was normal.  However, when Dr. Pincus distracted the petitioner by asking

-16-

him to spell the word "fist" and then to spell it backwards, the petitioner's fingers curled and gave resistance. That result was abnormal and exemplified frontal damage.

Dr. Pincus testified that he also considered historical factors. For example, the petitioner had scars on his back and reported being beaten frequently as a child. Dr. Pincus stated that an abused person is much angrier than a person who was not beaten. Dr. Pincus said that although most abused people have the capacity to be violent, they do not give in to that feeling. However, if the brain is not functioning properly due to mental illness and neurologic damage, an abused person's capacity to inhibit the violent impulse is defective.

Dr. Pincus testified that the petitioner was not malingering on the tests, and he summarized his findings as follows:

> He has evidence of neurologic dysfunction. On my examination the frontal lobes of the brain were not working properly. I didn't mention that his reading was also at a fifth grade level, so he's not [reading] terribly well. And he's also -- in serial seven he made a mistake in -- in doing that. All of that's part of the battery. The fact is his arithmetic probably is not so good. And -- but the frontal lobe of the brain is not working properly. And his affect, his -- his emotionality when we were together -- seemed very, very flat.
>
> . . . .
>
> [T]he frontal lobe is very important as a controller of expression of emotion. People with frontal lobe damage tend to be flat and tend to have a flat affect. And it was -- it's not the only thing that can cause a flat affect. It just was consistent with the other findings. And he had more than three of these abnormal findings, abnormal two and three-step Luria as well, and the hyperreflexia, dysarthria. All that goes along with a picture that is consistent with what the neuropsychologist found, consistent with what the MRI found. And he's damaged. There's no question about it. Not functioning normally.

Dr. Pincus explained that someone with frontal lobe damage becomes frustrated easily, has a low "boiling point," and has very little capacity to control their behavior when angry. He characterized the condition as similar to being drunk all of the time.

On cross-examination, Dr. Pincus was asked to identify the petitioner's mental illness. Dr. Pincus testified that he could not say with certainty, noting that the petitioner's maternal grandfather had been diagnosed as schizophrenic. He also alluded to paranoia because the

petitioner did not trust people, had no successes, and had no intimate relationships. Dr. Pincus conceded that the petitioner's history of incarceration could have played a role in his perceived paranoia.

When questioned about the facts of the petitioner's crimes, Dr. Pincus testified that the crimes involved planning. However, the use of the shotgun may have been impulsive. Dr. Pincus stated that nothing indicated the petitioner's actions on the night of the homicide were the result of a delusional act, and he conceded that incarceration was the best place for someone like the petitioner. Dr. Pincus said the petitioner was able to understand the wrongfulness of his actions but was unable to combat the impulse.

Dr. Pamela Auble, a neuropsychologist, testified that she first met the petitioner at Riverbend Maximum Security Institute on April 17 and 25, 2001. Dr. Auble interviewed the petitioner and administered tests. She spent a total of five hours with him, and she described him as cooperative although his speech was not always clear.

Dr. Auble testified that she had access to a report from Dr. Pendergrass, a psychologist who administered the Wechsler I.Q. test to the petitioner. Dr. Auble also had access to the petitioner's school records, his Memphis City School Mental Health Center records, his records from the Juvenile Court of Memphis/Shelby County, his records from the Midtown Mental Health Center, the psychological assessment completed by Dr. Geraldine Bishop, Dr. Pincus' report, various interviews by the petitioner's family members, and a transcript of the trial. From her evaluation, Dr. Auble wrote a psychological report, including a social history of the petitioner.

Dr. Auble testified that Marie Cribbs was "a pretty inadequate person." Marie had been through a lot in her life and was not able to be a good parent to the petitioner. The petitioner had little to no supervision by his mother. His juvenile records reflected that his mother failed to bring him in for visits/meetings, and he had numerous unexplained school absences. Dr. Auble stated that children needed to have a mother in order to develop normally and that poverty made it difficult for everyone in a family. She considered the history of mental illness in the petitioner's family, specifically his maternal grandfather. She also considered the head injury the petitioner sustained in a car accident. The petitioner's relatives reported that he acted strangely after the accident. Specifically, he had a fear of cars and being inside them.

Dr. Auble testified that she also considered the petitioner's history of eating inedible objects as a child. The petitioner ate sponges, cotton, paper, and hair. The petitioner did not eat meat until he was twelve years old, and the family reported that he ate "largely junk food." Dr. Auble said the petitioner's eating behavior could have been a sign of a mental disorder. She also related that eating non-food items often was associated with lead poisoning.

Dr. Auble testified that she discovered a history of alcoholism in the petitioner's maternal uncles. The petitioner did not do well in school and was in special education classes throughout

his schooling. The petitioner's school records reflected that he was functioning one to three years below his grade level. In 1984 to 1985, when he was thirteen years old, the petitioner was tested in the Memphis City School system and was found to have an I.Q. of 70. The petitioner also was found to have significant developmental delays in his ability to read, write, and do arithmetic. The petitioner transferred schools frequently. He attended seven different schools in his junior high and high school years and transferred a total of thirteen times during that period.

Dr. Auble testified that the petitioner began getting into trouble when he moved to Memphis. He was living in an environment with a lot of violence and drugs. According to Dr. Auble's records, the petitioner began using marijuana when he was twelve or thirteen years old, and he also used cocaine. The petitioner sustained two gunshot wounds in the late 1980s. In 1983, the petitioner was given the Ammons Full Range Picture Vocabulary Test, which showed he had an I.Q. of 82. However, Dr. Auble had never heard of the test previously and said it was no longer commonly used. She also stated that "very likely," the Ammons test indicated an I.Q. higher than his actual I.Q. In 1985, the petitioner scored 70 on the Wechsler I.Q. test. He took the Wechsler test again in 1999, five years after the crimes, and scored 75.

Dr. Auble testified that she administered the following tests to the petitioner: the Halstead-Reitan battery, including a speech perception test; the seashore rhythm test; the tactual performance test; trail making, finger oscillation, and grip strength; the Wechsler Memory Scale Three; the Ruff Figural Fluency test; the Wisconsin Card Sort; the Controlled Oral Word Association; the Boston Naming Test; the Grooved Pegboard Test; the Digital Vigilance Test; and the written portion of the Woodcock-Johnson Test of Achievement Revised. Dr. Auble also used the Test of Memory Malingering to determine whether the petitioner was putting forth good effort.

Dr. Auble testified that the petitioner tried hard and did his best on the tests. Her diagnosis at the end of the testing was as follows:

> That he has cognitive compromise, that he's, you know, he's . . .
> got evidence of brain dysfunction and that I think its, you know,
> from something that happened to him pretty early on.

Dr. Auble found her conclusions consistent with those reached by Dr. Pincus and the MRI. Additionally, she determined that "according to the Tennessee statutory definition of mental retardation," the petitioner had "significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient of 70 or below with a reasonable degree of certainty." Dr. Auble concluded that the petitioner had deficits in adaptive behavior to a reasonable degree of psychological certainty and that the mental retardation manifested during the developmental period or by age eighteen.

Dr. Auble testified that paranoid schizophrenia was defined as "paranoid delusions, hallucinations . . . a subset of schizophrenia which has both positive and negative sides." She

explained that positive signs were delusions and hallucinations, while negative signs included changes in emotion, volition, and speech. Dr. Auble stated that the average age of onset for schizophrenia was generally between eighteen and thirty and that paranoid schizophrenia could have a later onset. She said that about fifty percent of people diagnosed with schizophrenia had substance abuse problems and that distinguishing a person with paranoid schizophrenia could be difficult because of the behavior caused by the substance abuse. She explained that "some types of drugs like cocaine . . . mimic some of the paranoid symptoms of schizophrenia, although, the negative symptoms are not so mimicked usually by cocaine abuse."

On cross-examination, Dr. Auble testified that in her report, she diagnosed the petitioner with borderline intellectual functioning with an I.Q. between 71 and 84. She stated that in her opinion, however, his functional intelligence was 70 or below. She explained that this new number was based on additional information she obtained after she wrote her report. Dr. Auble conceded that the petitioner's mental difficulty could have been the result of a brain injury sustained in a car accident or eating paint as a child.

When questioned about Dr. Nichols' 1994 report, which indicated the petitioner's I.Q. was actually higher than the 73 reported in 1989, Dr. Auble testified that "that was Dr. Nichol[s'] impression." Dr. Auble acknowledged that she used the scores she did because that was her interpretation of the Tennessee statute.

Dr. Geraldine Bishop, a psychologist, testified that she met the petitioner at the Riverbend Maximum Security Facility in the spring of 2000 and spent five to six hours with him. She described him as cooperative, although he appeared very angry when he was informed that she was there to determine whether he was mentally retarded. Dr. Bishop stated that his reaction was common in people with mild retardation, as they were well-aware they had deficits.

Dr. Bishop testified that in evaluating the petitioner, she administered a variety of tests, including the Adaptive Behavior Scale published by the American Association of Mental Retardation (AAMR). Dr. Bishop also met with Charlie Cribbs and his wife, the petitioner's uncle and aunt. She reviewed Dr. Thomas Pendergrass' report, the petitioner's school records, the Memphis City School Health Center records, the petitioner's juvenile court records, the petitioner's records from the Midtown Mental Health Center, Dr. Pamela Auble's report, Dr. Pincus' report, and a transcript summary of the trial. However, she did not consider any court testimony.

Regarding the assessment of adaptive deficits relative to mental retardation, Dr. Bishop testified that two scales were used as a screening device, the Vineland Social Maturity Scale and the scale published by the AAMR. She said she used the AAMR scale because it was more extensive. Dr. Bishop also took into account the petitioner's "historic adaptive functioning from records and interviews." Dr. Auble stated that in assessing adaptive deficits, it was important to have information about any kind of trauma that would have caused brain damage. Dr. Bishop

stated that when the petitioner was in the first grade, he was placed in a program for educable mentally retarded students. He remained in those classes throughout elementary school.

Dr. Bishop testified that the petitioner "consistently scored one to four years behind the average grade level of nonspecial ed students, so he was working at a great deficit." She explained that he did not exhibit any "particular behavior problems until . . . [h]e was in resource and not self-contained." She stated that "there's every evidence that the ability to function became compromised at that point and acting out began."

As for the petitioner's medical history, Dr. Bishop testified about a variety of factors she considered important. She began with the prenatal period. Dr. Bishop noted that the petitioner's family was extremely impoverished and did not always have enough food to eat. Dr. Bishop stated that Marie Cribbs was in her first trimester during the winter months and that the first trimester was a crucial time in development and the time when poor nutrition had the most devastating effects. Dr. Bishop also recounted what she described as the "considerable evidence" of "pretty severe abuse both of mother, Marie Cribbs, and of Perry Cribbs." She said Dan Cribbs, the petitioner' grandfather, was responsible for at least part of the abuse. Dr. Bishop also considered the petitioner's childhood automobile accident in which he was thrown into the dashboard of the car and out the window. The petitioner was rendered unconscious, which Dr. Bishop related to closed head trauma. Finally, Dr. Bishop considered the results of a recent MRI, showing the presence of structural abnormality in the brain. She said that even considering those numerous factors, she was unable to determine exactly what caused the petitioner's "brain problem." However, she explained that what was important was the existence of his deficits, not their cause. Dr. Bishop stated that the "possible reasons listed for the brain dysfunction" occurred prior to the petitioner's eighteenth birthday.

The AAMR Adaptive Deficit Scale is an adaptive scale composed of eighteen different domains. Ten domains deal with skill areas, including such areas as independent functioning. Part two of the test deals with subscales that address male adaptive behaviors.

Dr. Bishop testified that the petitioner did fairly well on some of the skills tests. She related that "[h]e had scores that would be considered every where from the normal range all the way on up to the severely delayed range." The results indicated the petitioner was not malingering. Dr. Bishop related that the petitioner exhibited deficits in adaptive functioning. She reported ten deficits on his scaling and eleven or twelve deficits on Charlie and Betty Cribbs' scaling. Dr. Bishop stated that a finding of two deficits was considered a sufficient number in order to establish a severe adaptive behavior. Dr. Bishop summarized that "[m]y conclusions are that Mr. Perry Anthony Cribbs has significant delays in adaptive behavior and that these delays were apparent during the development period or prior to the age of 18."

Dr. Bishop testified that the Vineland Adaptive Behavior Scales was administered to the petitioner in 1987 and that the Vineland score equated to an I.Q. score with a standard deviation

of 15. Dr. Bishop related that the petitioner scored 70 on the test. She explained that two standard deviations below the norm of 100 was the standard for mental retardation.

Dr. Bishop testified that the petitioner also was given the Wechsler Intelligence Scale for Children-Revised. According to the test, the petitioner had an I.Q. of 70, which was two standard deviations below the mean. Dr. Bishop said that all educational tests conducted on the petitioner revealed he was working at one to four years below grade level and that the petitioner was in the bottom five percent of the population. Based on the results of all the tests administered to the petitioner, Dr. Bishop concluded he had severe deficits in intelligence, educational achievement, and mental adaptive behavior. She explained that the results indicated mental retardation because they occurred during the developmental period. When the petitioner was in school, he was diagnosed with a "severe delay" and was placed in special education classes.

Dr. Bishop testified about psychological testing completed on the petitioner in 1986 by Dr. Battle. From the results of a Peabody Picture Vocabulary Test, Dr. Battle estimated the petitioner's verbal intelligence score was 46, reflecting he was in the moderately retarded range. Dr. Battle also estimated from the results of the petitioner's Draw-A-Person test that his I.Q. was 61, which would have indicated to a professional that more in-depth testing was needed. The petitioner would have been fifteen years old in 1986.

Dr. Bishop testified that the Midtown Mental Health Center never administered an I.Q. test to the petitioner; its evaluation was limited to competency. She said a person could be mentally retarded and still be found competent. Dr. Bishop said that neither she nor any other mental health professional found any psychotic indicators in the petitioner and that it was possible for a person to be mentally retarded but not insane. Dr. Bishop conceded that her partner, Dr. Wyatt Nichols, wrote notes indicating the petitioner had an I.Q. of 73 in 1989. Dr. Bishop stated that the Midtown Mental Health Center records failed to reflect any social history, any interviews with relatives, or any school records and that there was no indication in Dr. Nichols' report that the I.Q. was based on data. A 1990 letter to a Memphis General Sessions judge and contained in the record stated as follows:

> Perry Cribbs is functionally illiterate and of low intellectual functioning. However, his intellectual functioning is sufficient in order for him to proceed with the disposition of the charges.

Dr. Bishop stated that, had she been consulted at that time, she would have wanted the petitioner to receive in-depth testing.

Dr. Bishop testified that she reviewed Dr. Auble's report. Dr. Bishop acknowledged that Dr. Auble conducted the Halstead-Reitan Battery, which examined the neurological state of the individual lobe by lobe based on performance. Dr. Auble determined that "there was significant impairment and that the impairment reached the highest score that is normally given." Dr.

Bishop said Dr. Auble's results were significant because they indicated that "there is an organic condition and that organic conditions of the brain, particularly if they occur during the developmental period, are very much associated with the condition of mental retardation." Dr. Bishop stated that the petitioner had particular difficulty in visual perception functioning and that "one of the most important things that we need our visual perception functioning for is reading." Dr. Bishop also stated that Dr. Auble had determined the petitioner's memory and his ability to concentrate were intact. Dr. Bishop interpreted those findings to mean the petitioner failed to achieve because his brain did not function well, not because he was unable to remember things.

Dr. Bishop testified that the petitioner had trouble performing two-part instructions. She stated that the additional instructions "upp[ed] the level of complexity" and that while most mentally retarded persons could adequately function with simple tasks, their ability to function with increasing complexity was compromised. Dr. Bishop noted that the petitioner showed "atrophy in the parietal cortex." She explained that he could plan an activity for something very familiar to him. However, if something was unfamiliar, his entire planning system could break down.

Dr. Bishop testified that she reviewed Dr. Pendergrass's WAIS-3 testing, which indicated the petitioner had an I.Q. of 75. She stated that the rate of error was slightly over five points. Dr. Bishop opined that the petitioner was at the lower end of the score as opposed to the higher end. She based her conclusion on the pattern of test findings related to the petitioner and the fact that he was educated with mentally retarded students when he was in school. The fact that the petitioner was placed in classrooms with mentally retarded students limited the amount he believed he could achieve. Dr. Bishop also related that there was potentially "[c]losed head trauma from abuse, certainly from the auto accident, chronic malnutrition in the early years; this was probably too during pregnancy."

Dr. Bishop testified that she concluded the petitioner had a "significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient of 70 or below." She agreed that he had deficits in adaptive behavior and that mental retardation manifested during the developmental period or by age eighteen. In her opinion, the petitioner was mentally retarded in accordance with the Tennessee definition of mental retardation.

Dr. Bishop testified that records illustrated Marie Cribbs' deficits as a parent. She was often ill and was not emotionally available to her children. Marie was illiterate and unable to assist her children with their schoolwork.

On cross-examination, Dr. Bishop testified that her practice was geared towards individuals not incarcerated. She acknowledged that at the time of her report, the petitioner had been incarcerated off and on since 1989. She said that statements from the petitioner's aunt and uncle indicated his mother did numerous personal tasks for him, such as bathing, that other youths did independently. According to information contained in a school record, the petitioner's mother said he was helpful around the house by washing floors, doing laundry, ironing clothes,

and cooking for himself and his siblings. Dr. Bishop stated that it was a matter of whom you believed, the petitioner's mother or his aunt and uncle.

Dr. Bishop acknowledged that in 1985, the school tested the petitioner and came up with a primary diagnosis as "unspecified mental disorder, special education diagnosis, other handicapping condition, and then conduct disorder as a secondary diagnosis undersocialized, nonaggressive." She further acknowledged that the school did not diagnose him as mentally retarded. Dr. Bishop conceded that the petitioner had been unable to "go out and get jobs and go to banks and deal with the outside world because he's been incarcerated."

Dr. Bishop acknowledged that Dr. Nichols concluded the petitioner had an "[i]ntellectual level higher than the assessed I.Q. of 73 in 1989." Dr. Bishop then was questioned about the criteria for antisocial personality. The Diagnostic and Statistical Manual of Mental Disorders (DSM IV) provided the following criteria for antisocial personality:

> A. There's a pervasive pattern of disregard for the violation – for and violation of the rights of others since age 15 as indicated by three or more of the following: failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest. Two, deceitfulness as indicated by repeated lying, use of aliases or conning others for personal profit or pleasure. Three, impulsivity or failure to plan ahead. [sic] Four, irritability, aggressiveness as indicated by repeated physical fights or assaults. Five, reckless disregard for the safety of self or others. Six, consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Seven, lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

> The individual is at least 18 years of age.

> C . . . There is evidence of this conduct disorder with onset before age 15. And, D, The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or manic episode.

Dr. Bishop acknowledged that the petitioner had never been diagnosed as schizophrenic or manic. She also agreed that he was diagnosed with conduct disorder prior to the age of fifteen. She conceded that "[t]he part two would definitely agree with the [definition for antisocial personality disorder]." Notwithstanding, Dr. Bishop added that "[a]ntisocial personality disorder does not preclude a diminished intelligence." On redirect examination, Dr. Bishop testified that she could rule out the possibility of antisocial personality disorder due to the presence of brain damage.

Jackie Cannon was recalled to the stand to testify. She immediately invoked the Fifth Amendment, stating that she had "already testified and that she was sticking to that." When asked to review a document, Cannon stated that she could not read, that she dropped out of school, and that she made all Fs while in school. She said she was not "a big drug user" but that she "[knew] about drugs." Cannon received treatment at the Midtown Mental Health Center in July 2000.

Cannon testified that she last saw the petitioner when he "got the death penalty." She added that "the time before then was when . . . he attempted murdering me." However, no charges were filed against him at that time. Cannon acknowledged that she was convicted of theft of property in January 1991. She explained that "it's just a petty charge. Some people got records long as 20 criminal offenses. But I don't have but three."

Dana Cook testified that she was employed with the Post-Conviction Defender's Office as an investigator in 1999 and met with Jackie Cannon in March 1999. Cannon admitted to Cook that she lied at the petitioner's trial in order to get him out of the house, and Cook obtained an affidavit signed by Cannon. According to the affidavit, the Mickey Mouse watch belonged to another person. On cross-examination, Cook acknowledged that she did not know Cannon could not read. She also stated that her handwritten notes from her conversation with Cannon did not reveal Cannon was lying when Canon said the petitioner gave her the Mickey Mouse watch.

Janann McInnis, an investigator and document specialist with the Office of the Post-Conviction Defender, testified that she met with Jackie Cannon on September 13, 2001. She said that Cannon appeared to understand the affidavit and that Cannon "took it and looked at it. She read it. She understood what she was reading." When Cannon was asked about the affidavit, she responded "yes." On cross-examination, McInnis testified that she was not personally involved with interviewing Cannon.

The State presented the testimony of Dr. Wyatt Nichols, a psychologist in private practice and a consultant to the Midtown Mental Health Center's Forensic Program. Dr. Nichols testified that in 1994, the court directed him to evaluate the petitioner in relation to the capital murder charge. He explained that because the State required a physician to be part of the evaluation team, he and Dr. Baldwin, a psychiatrist, evaluated the petitioner on July 20, 1994.

Dr. Nichols testified that the Midtown Mental Health Center had evaluated the petitioner in July 1989, June 1990, and October 1990. While those prior evaluations were irrelevant to a determination of competency, Dr. Nichols consulted the I.Q. tests previously administered. In Dr. Nichols' opinion, the petitioner was competent to proceed to trial in 1994. The petitioner understood the charges against him, could work with counsel, and had an understanding of the role of the various participants in the courtroom. Dr. Nichols further concluded that an insanity defense could not be supported for two reasons. First, the petitioner did not have a history of mental illness or treatment and did not present any psychological symptoms. Second, the

petitioner maintained that he did not commit the crime. Dr. Nichols read Dr. Baldwin's note relating to the petitioner's evaluation. The note stated as follows:

> Mr. Cribbs was evaluated today pursuant to court order. He was guarded, suspicious, evasive, denied all allegations, he's in the process of hiring a private counsel. It is my impression he understands the judicial process although he was in special ed in school. An IQ has been found to be in the 70 range.

Dr. Nichols testified that the I.Q. test administered in June 1990 revealed the petitioner had a verbal I.Q. of 76, a performance I.Q. of 73, and a full scale I.Q. of 73, which was not in the mentally retarded range. He stated that in his opinion, the petitioner's intellectual level was actually higher than the I.Q. of 73 and was "[m]ore like the mid to high 80s." Furthermore, in his opinion, the petitioner suffered from antisocial personality. The petitioner's school records showed he also was examined in November 1984 and February 1985. Those tests indicated a full scale I.Q. of 70, with his verbal I.Q. being 75 and his performance I.Q. being 69. In 1985, the petitioner's diagnosis was "unspecified mental disorder, other handicapping conditions, conduct disorder, socialized, nonaggressive."

Dr. Nichols testified that in 1990, the Minnesota Multiphasic Personality Inventory (MMPI) was administered to the petitioner. Dr. Nichols also was aware that Dr. Auble scored the MMPI. In Dr. Nichols' opinion, it would have been unlikely for a mentally retarded person to have completed a valid MMPI profile. He explained that a person needed to have at least a sixth grade reading level in order to complete the MMPI with a valid result. He qualified his statement by saying that a person who was retarded could take the MMPI and produce a valid profile but that it was unlikely the MMPI would be administered to a mentally retarded person. The fact that the petitioner took an MMPI that produced a valid profile indicated to Dr. Nichols that the petitioner was functioning higher than a mentally retarded level.

On cross-examination, Dr. Nichols was asked about Dr. Pincus' conclusion that the petitioner had frontal lobe disorder. Dr. Nichols stated that "[a] large number of people [have] front lobe damage," including persons with ADHD. He explained that he could leave the courtroom, hit his head on a windshield, and have frontal lobe damage. He acknowledged that he evaluated the petitioner only to determine competency and sanity.

Lopaka Thomas, an acquaintance of Jackie Cannon, testified that in 1992, Cannon was living at LaMoyne Gardens. Thomas dated her for seven or eight months, but in 1994, he was incarcerated for violating his parole. Thomas stated that while he was living with Cannon, he observed her use crack cocaine on several occasions and saw her hallucinate. Cannon also was not taking care of household needs or her children.

Eugene Bowen testified that he lived in LaMoyne Gardens in 1980 and knew Jackie Cannon in 1993 and 1994. Bowen knew Cannon used illicit drugs because he saw her buy crack

cocaine. He acknowledged that he sold the cocaine to her. Jackie Cannon also would just scream at times. In 1993 and 1994, a person named James Polk, also known as "Duck Head," lived with Cannon. On cross-examination, Bowen testified that the petitioner lived with Cannon when he was released from prison in the fall of 1993.

Bowen testified that he knew the petitioner and that the petitioner was playing basketball with him on the night of Linda Harris' murder. The petitioner's daughter was with the petitioner. After they finished playing ball, Bowen and the petitioner walked to get a beer. Later, Bowen saw the petitioner and "Wham" arguing. He explained that "Wham" was Jackie Cannon. Bowen said the petitioner's attorneys never contacted him.

Regina Ewing testified that she also lived in LaMoyne Gardens in 1994 and that she helped Jackie Cannon clean her house and feed her children. One day, Cannon came to Ewing's home and was screaming that someone was in her house. When Ewing went to investigate, no one was there. During the incident, Cannon admitted to Ewing that she was "on this stuff." Ewing stated that she never saw Cannon use drugs. Ewing said that, had she been contacted by the petitioner's attorneys, she would have testified about Cannon's behavior.

Darlene Donald, Linda Harris' sister, testified that she thought it was odd that Sidney Harris backed his car into the driveway on the night Linda was murdered. Donald stated that there were financial problems in her sister's marriage. She also witnessed Sidney Harris verbally abuse Linda and was aware that he had physically abused her.

## C. Findings of the Post-Conviction Court

In a fifty-five page order entered on May 23, 2006, the post-conviction court denied relief. The court concluded that the petitioner had failed to demonstrate a basis upon which post-conviction relief could be granted. The court's findings of fact and conclusions of law are summarized as follows:

> Petitioner claims that trial counsel should have requested expert assistance in investigating forensic evidence against him and in evaluating his mental status. Petitioner contends expert assistance was needed to challenge the testimony of the State's pathologist regarding injuries sustained by the victim and to provide proof regarding the distance and angle of Linda Harris' fatal gunshot wound. Petitioner further argues that evidence was available at the time of trial to warrant counsel's request for funding for expert assistance regarding the issue of Petitioner's mental status.

> This court finds Petitioner's allegations relating to expert services are without merit. . . . Since the initial indication from

-27-

Midtown Mental Health was that Petitioner was competent to stand trial and did not suffer from a psychiatric disorder, this Court finds Petitioner's reliance on Ake is misplaced.

. . . The Petitioner has failed to show deficient performance by trial counsel for failing to seek assistance for experts and further fails on two levels to show that prejudice resulted from the failure. First, he has made no showing that the initial threshold of Ake has been met. The Petitioner has not shown that had an effort been made to seek expert funding, the trial court would have been required to grant that request. Second, the Petitioner has failed to show to a reasonable probability that had an expert been funded and used at trial, the resulting testimony would have had any effect on the jury's decision.

More importantly, . . . it appears counsel's failure to request funds for expert services occurred due to [counsel's] conclusion that such a request for funds was not necessary. Both of Petitioner's trial counsel testified . . . that, after discussing all of the issues in the case and the evidence to be presented with the Petitioner, they believed the Petitioner fully comprehended the trial process, the evidence against him and the charges he was facing. Specifically, defense counsel . . . testified that had she known there "was some sort of mental problem or anything like that," she would have "not let that just slide by." However, . . . she "never got any inkling from Mr. Cribbs that . . . he was mentally deficient or that there was any problem."

Second, it is unlikely that a request for such services would have been granted.

. . . [A]ccording to the testimony at the post-conviction hearing, . . . there was no basis upon which to request the services of a mental health professional. The initial threshold requirement . . . is a showing of necessity. . . . [I]t appears they would have been unable to meet the Rule 13 requirements. Thus, the Petitioner has failed to demonstrate trial counsel was ineffective in failing to make such a request. Trial counsel stated they were unaware of any mental deficiency on the part of the Petitioner and further stated that the Petitioner was evaluated and found to be competent prior to trial. Therefore, Petitioner has failed to demonstrate that, even if such a request had been made, he would have been entitled to the requested services pursuant to the mandates of Rule 13.

Similarly, this Court finds Petitioner has also failed to demonstrate the necessity for expert assistance in assessing the forensic evidence against him. Petitioner has presented no proof in support of his bare allegation . . . nor has Petitioner actually indicated what he would have hoped to have proven or explained with the aid of such an expert. Therefore, it is . . . unclear whether such services would have been granted even if counsel had made the request.

. . . .

Petitioner contends trial counsel's failure to make a motion for pre-trial discovery and production of certain exculpatory evidence rendered his assistance ineffective. Petitioner's claims are not supported by the proof presented at the post-conviction hearing. At the hearing, trial counsel testified that a Motion for Discovery was filed, requesting the production of "anything material to the preparation of the accused's defense." In addition, trial counsel stated another motion for production of exculpatory evidence was filed along with a motion for the court to order the State to allow the defense to inspect any statements which establish the innocence of the accused. . . . [T]rial counsel testified that, prior to the trial, the prosecutor afforded the defense team "open file" discovery. Therefore, this Court finds Petitioner's allegation of ineffective assistance of counsel on this issue is without merit.

. . . .

Petitioner alleges trial counsel was ineffective in failing to present evidence to support his theory that the victim's husband, Sidney Harris, arranged to have his wife murdered for monetary gain. . . . Petitioner contends trial counsel should have interviewed Parker and the man known to Parker as "Lil" Rob, whom Parker claims actually killed Linda Harris. Additionally, Petitioner contends trial counsel should have interviewed Sidney Harris' brother, Al Harris. He claims Al Harris' statement to the police questioning the veracity of Sidney Harris' version of the events surrounding Linda Harris' murder was relevant and should have been presented to the jury. Finally, Petitioner contends trial counsel should have investigated evidence establishing an alibi defense. He claims trial counsel should have presented testimony from Eugene Bowen establishing his alibi.

-29-

. . . Petitioner's trial counsel testified that he was aware of Parker and Harris' statements and that he attempted to discern the veracity of the statements. Counsel further indicated that the defense team was aware that Mr. Harris was involved in multiple extramarital relations and stated that their investigator prepared a report on Harris. The defense was also aware of a statement made by Al Harris . . . that implied that Sidney may not have disclosed all pertinent information about his life. . . . [T]he investigators for the defense did a thorough background check of Harris and found no evidence to corroborate the Petitioner's assertion about the drugs. Petitioner's trial counsel . . . testified that . . . considering the injuries sustained by Harris . . . a defense asserting Harris was involved in planning the murder of his wife would unnecessarily antagonize the jury, outweighing any benefit to the defendant.

. . . .

. . . [T]he Petitioner failed to offer the testimony of the man known as "Lil Rob" or Al Harris to support the allegations. Therefore, this Court could not conclude that such a material witness existed or prejudiced the Petitioner. . . . [I]t is not the role of this Court to second guess the trial strategy of defense counsel. Rather, this court will give deference to informed tactical decisions of trial counsel. Here, it appears trial counsel was aware of the statement made by Parker, attempted to investigate the statement, and made an informed decision not to present certain evidence to the jury. . . . [T]his Court does not find counsel was ineffective in failing to present such evidence at trial. Moreover, Petitioner has failed to demonstrate he was prejudiced by counsel's failure to present evidence of Parker's assertions.

Additionally, this Court finds Petitioner's contention that defense counsel should have investigated and pursued an alibi defense also has no merit. . . . Eugene Bowen testified that on the night of the murder, Petitioner and his young daughter were playing basketball with him until 1:00 a.m. Even if this Court were to find Bowen's testimony credible, Petitioner has failed to demonstrate how counsel's performance was deficient. . . . [T]his Court does not find Bowen's testimony credible or persuasive. . . . Petitioner's defense counsel . . . testified that he asked Petitioner to provide him with any witnesses or any persons who could help with his defense. The only name given by Petitioner was the name of Jackie Cannon. . . . Petitioner never mentioned Bowen prior to

-30-

or during the trial. Therefore, counsel had no reason to interview or call Bowen as a witness. Petitioner cannot now claim his counsel was ineffective for not presenting certain evidence that Petitioner failed to disclose to counsel for preparation of trial.

. . . .

Petitioner contends trial counsel should have requested the trial judge, Judge Fred Axley, to recuse himself, based upon a perceived bias against capital defendants. . . . Petitioner contends that since Alley was decided only a few months prior to this trial, counsel should have requested the trial judge recuse himself from hearing Petitioner's trial as well.

It seems that recusal of Judge Axley in Alley was based solely on the avoidance of a public perception of partiality. The Petitioner . . . . offers no specific bias or acts of prejudice against him by this particular judge.

Unlike the petitioner in Alley, who pointed to numerous statements indicating a bias by the trial judge . . . Petitioner has failed to present such proof. . . . Until the judge had demonstrated a personal bias specifically directed [at] the Petitioner in the instant case, counsel had no grounds upon which to solicit the recusal of the judge. . . . Petitioner failed to present any credible evidence that such a bias had manifested itself prior to or during the trial. There were no specific incidents or statements offered by the Petitioner for this Court to review. . . . [C]ounsel was not ineffective in failing to request the trial judge recuse himself from the instant case.

. . . .

Petitioner contends trial counsel's performance during jury selection was not effective. . . . Petitioner claims counsel failed to rehabilitate jurors as part of the Witherspoon process; failed to adequately explain the meaning of mitigating circumstances and failed to exclude jurors who would not consider mitigation; failed to challenge jurors who were "predisposed" to the death penalty; failed to exclude jurors who were victims of violent crime or who had close family or friends who had been a victim of violent crime; failed to question jurors about racial bias; and, failed to object to

-31-

the State's improper removal of jurors based upon race, sex, or age.

. . . Petitioner has failed to demonstrate that counsel's performance, during the selection of the jury, fell below the requisite standards of competence. . . . [M]any of the issues raised by the Petitioner have been rejected by the Tennessee Appellate Courts. . . . [T]here is no indication on the record that trial counsel failed to follow the mandates of Witherspoon and/or failed to adequately question jurors regarding the range of punishment and their ability to consider mitigation evidence. Other allegations . . . are simply without merit. In particular, Petitioner failed to point to any particular juror that was either racially biased; affected by prior violent crime; or improperly struck by the prosecution. Thus, they have failed to establish counsel was ineffective on these matters. Furthermore, even if counsel were ineffective, Petitioner has failed to demonstrate how he was prejudiced by counsel's action or inaction.

. . . .

Petitioner makes several allegations relating to the testimony of Jackie Cannon. First, Petitioner asserts trial counsel's pre-trial investigation of Jackie Cannon should have included a request for production of Cannon's mental health and juvenile records. He claims Cannon has a history of mental health problems and drug abuse. Thus, Petitioner also contends trial counsel should have requested a psychiatric examination of Cannon prior to her testifying at trial.

. . . .

. . . Cannon either refused to answer their questions or continued to assert that her trial testimony was truthful. When asked if she had given two separate affidavits contradicting or recanting portions of her trial testimony, Cannon specifically denied having given the statements or signing the affidavits. One fact upon which Cannon vehemently insisted was that the petitioner "attempted" to "murder" her in order to prevent her from going to the police.

With regard to Petitioner's allegations that counsel should have obtained Cannon's medical and juvenile records, . . . the Petitioner offered no evidence to show trial counsel should have

-32-

been aware of Cannon's problems. In fact, during the trial, the Petitioner, who lived with the witness at the time of the murder, provided counsel with no information regarding any present or past mental health or drug problems the witness may have suffered from at the time of her trial testimony. Other than Cannon, who was likely not forthcoming about such details, the Petitioner was the best source for such information. It was up to the Petitioner to alert counsel that there may be some mental health issues relating to Cannon's testimony. Every witness will not be investigated for mental health issues unless pertinent information is discovered by counsel which related directly to the case.

Therefore, Petitioner cannot now claim ineffective assistance of counsel because he chose to remain silent about certain mental health issues. . . . [T]he Petitioner was unable to show that, when Cannon testified at trial, she actually suffered from mental illness or was under the influence of drugs. Thus, this Court is not inclined to find trial counsel was ineffective in failing to request Cannon's mental and juvenile records.

. . . .

Petitioner challenges trial counsel's performance during the cross-examination of several of the prosecution witnesses. . . . Petitioner's claims center around the defense theory that Sidney Harris was involved in his wife's murder. . . . Petitioner challenges trial counsel's performance with regard to his cross-examination of Harris. . . . Petitioner further contends counsel's cross-examination of various Memphis Police Department officers . . . was inadequate.

. . . .

With regard to the cross-examination of Harris and the Memphis Police Officers, . . . this Court finds counsel's performance not deficient. . . . [T]rial counsel specifically stated that he was concerned that a defense which attacked Harris would result in backlash from the jury directly to the Petitioner. This Court finds such decisions to be reasonable tactical maneuvers made by informed and adequately prepared counsel. Additionally, as the Supreme Court noted on direct appeal, Harris testified at trial that he was injured in the attack and was heavily sedated when he first spoke to police. Thus, although it appears counsel

-33-

attempted to exploit certain discrepancies, the jury accepted Harris' explanation.

Counsel's decision to not call James Parker as a witness, during the guilt phase . . ., is equally attributable to strategy. Again, this Court will not second guess trial counsel's strategy unless it falls below the acceptable standards. . . . [T]his Court does not give great weight to the credibility of Parker. Essentially, counsel would have been pitting the credibility of Parker against that of Harris, who himself, had been injured in the attack. . . . Sgt. McWilliams testified that he followed up on the information provided by Parker, but found no link to the murder. . . . McWilliams further stated that there was no credible evidence that someone else was involved in the murder.

. . . .

Petitioner contends trial counsel was ineffective in failing to adequately prepare for the sentencing phase of the trial. . . . The Petitioner, as the sole witness for the defense, testified based upon a theory of residual doubt. The Petitioner now alleges that, had his friends and family been contacted, they would have testified on his behalf during the sentencing phase . . . . Petitioner contends this testimony regarding his social background and mental health would have added considerable mitigation to his case. Additionally, Petitioner contends trial counsel should have called James Parker in support of their theory that the victim's husband was involved in her death.

At the post-conviction hearing, multiple members of the Petitioner's family testified that, had they been contacted, they would have offered testimony concerning the Petitioner's trouble[d] childhood, including the fact that Petitioner had been shot as a teenager, the effect of his father's absence throughout his life, the history of mental illness in his family, the Petitioner's academic struggles and odd childhood behaviors, and a head injury and other illnesses suffered by Petitioner as a child. However, it appears the Petitioner provided trial counsel with no names of individuals that may have been helpful in his defense during this phase of the trial. In addition, at the post-conviction hearing, trial counsel testified that the defense team contacted several family members prior to the beginning of the sentencing phase and were told not to call back.

-34-

. . . .

Initially, this Court finds that, at best, there is conflicting testimony regarding whether or not the Petitioner's family would have participated in the sentencing phase of the trial. . . . This Court accredits the testimony of trial counsel who stated that the defense team attempted to contact the Petitioner's family members but were told not to call back. Additionally, this Court finds trial counsel were not negligent in failing to call James Parker to support a theory of residual doubt and attack the victim's husband. Trial counsel testified that they attempted to ascertain the veracity of Parker's claims, but were unable to do so. In his statement to police and again at the post-conviction hearing, Parker stated that he did not know the actual names of the persons he claimed Sidney Harris hired to kill his wife. He further stated that he had no personal knowledge of the events surrounding Linda Harris murder. . . . [T]he Court finds Parker's testimony . . . would have added very little to Petitioner's mitigation. Thus, this Court finds defense counsel's performance was not deficient due to their failure to be present at the sentencing phase. Also, the testimony of each of the Petitioner's family members and testimony of James Parker does not impact trial counsel's performance in such a manner that prejudices the Petitioner and the result of the case.

Moreover, even if this Court were to find counsel's performance at the sentencing phase to be deficient, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to call certain witnesses on his behalf. Trial counsel . . . testifie[d] that certain witnesses did not want to testify.

. . . Trial counsel testified that the defense team attempted to contact the witnesses[;] however, Petitioner's family rebuffed their attempts. Moreover, despite the lack of testimony . . . , Petitioner testified during the sentencing phase of trial; and, thus, had an opportunity to discuss his background in detail. Thus, it was not as if defense counsel failed to put on any mitigation proof. . . . Finally, the State presented indisputable evidence of two [enhancement] factors: (1) that the murder was committed in the perpetration of a burglary; and (2) that the defendant had been convicted of one or more prior violent felonies. Thus . . . this Court finds that, even if counsel's performance was deficient, the Petitioner has failed to demonstrate he was prejudiced by counsel's alleged inaction.

. . . .

Petitioner claims trial counsel was deficient in failing to investigate one of the prior convictions which the State used to prove an aggravating circumstance. Specifically, Petitioner contends trial counsel should have filed a motion to invalidate his 1990 guilty plea. . . . Petitioner has failed to present evidence that his 1990 conviction is "constitutionally invalid," or that trial counsel should have been aware that the conviction was constitutionally infirm.

. . . [E]ven if <u>one</u> of the prior violent felony convictions was excluded, the State . . . could have relied on other prior convictions to prove the existence of this particular aggravating circumstance.

. . . .

Petitioner contends trial counsel should have objected to the prosecutor's comments regarding the impact of the crime on the victim's family and the possibility that Petitioner might be eligible for parole. Petitioner also contends trial counsel should have objected to the State's referencing a watch they claimed was stolen from the victim's residence and found in Petitioner's possession.

Regarding the State's referencing the loss to the victim's family and Petitioner's eligibility for parole, this Court finds that these matters were fully and fairly litigated on direct appeal. . . . Therefore, it is improper for Petitioner to now attempt to re-litigate these issues through the guise of an ineffective assistance of counsel claim.

Petitioner also contends counsel should have objected to the State's references, during closing argument, to a Mickey Mouse watch they argued was stolen from the victim during the murder. Petitioner contends that because the watch was not introduced into evidence, the State was precluded from discussing it in closing arguments. . . . [A]t trial, Jackie Cannon specifically testified that she found the watch among the Petitioner's belongings and he told her it belonged to the woman he had killed. . . . Sidney Harris had identified the watch as one belonging to his wife, and stated the watch was missing from their home after the murder. . . . Thus,

this Court finds the State's argument was proper and trial counsel was not ineffective in failing to object.

. . . .

Petitioner claims trial counsel was ineffective due to his failure to object to the trial court's instruction[s] to the jury. Petitioner contends the instructions: (1) improperly shifted the burden to the Petitioner to show the existence of mitigating circumstances; (2) did not adequately define mitigation; (3) did not adequately explain how the jury was to consider and weigh mitigating evidence; (4) improperly limited the jury's consideration of mitigating factors; (5) diminished the jury's responsibility in imposing the death penalty; (6) failed to narrow the class of persons eligible for the death penalty; (7) included aggravating circumstances which improperly duplicated an element of the charged offense; and (8) improperly allowed the jury to consider the same set of facts in determining the applicability of both aggravating circumstances.

Petitioner has failed to demonstrate that the trial court rendered a charge outside the confines of the law as it existed at the time of sentencing. Thus, trial counsel was not ineffective in failing to object to the jury charge at the sentencing phase of the trial, nor was the defense team ineffective in failing to request additional or amended instructions.

. . . .

Finally, the Appellate Courts have routinely rejected the types of claims asserted by Petitioner in this portion of his petition.

. . . .

Petitioner claims trial counsel was ineffective in failing to object to the trial judge's "bolstering" of the prosecutor's qualifications in the presence of the jury. It appears . . . that the trial judge briefly commented on the educational background of the prosecutor. No objection was raised. However, this Court finds trial counsel was not ineffective in failing to object to the trial judge's comments. Moreover . . . Petitioner has failed to demonstrate he was prejudiced by the comments in that the jury decision would have been different but for the comments.

-37-

. . . .

Petitioner alleges trial counsel should have moved to strike the death penalty as a sentencing option because it violates treaties by the United States and established international law.

Petitioner cites no case that has applied international law as a bar to the implementation of the death penalty in the United States and this court is aware of no such ruling. To the contrary, the Sixth Circuit Court of Appeals, in Buell v. Mitchell, 274 F.3d 337 (6th Cir. 2001), rejected similar challenges to the Ohio death penalty statute. . . . Moreover, the authority supporting the proposition that no international law or treaty prohibits a state from imposing the death penalty is well-settled. Therefore, this Court finds trial counsel was not deficient in failing to challenge the death penalty based upon international law.

. . . .

Petitioner contends trial counsel was ineffective in failing to raise the issue of Petitioner's mental retardation during the sentencing phase of his trial. In conjunction with this argument, Petitioner also contends he is mental[ly] retarded and was mentally retarded at the time of the offense, and, thus, cannot be executed under Tennessee's death penalty statute.

. . . .

This court notes that the statute precluding the execution of mentally retarded [defendants] was enacted in 1990, prior to Petitioner's trial and appeal. However, the Van Tran decision holding that executions of such individuals violates the United States and Tennessee constitutions was not decided until 2001, four years after the conclusion of petitioner's direct appeal. Thus, Petitioner's claim that he is mentally retarded has not previously been litigated either at the trial court level nor addressed upon direct appeal. . . . [D]espite his arguments to the contrary, Petitioner is not entitled to a jury trial on the issue of mental retardation and the State does not bear the burden of demonstrating Petitioner is not mentally retarded.

. . . .

-38-

This court finds that Petitioner does not meet the definition of mental retardation under Tenn. Code Ann. § 39-13-203. . . . Petitioner's general intellectual functioning has been evaluated on several occasions throughout his adolescence and adulthood. In 1984, Petitioner was found to have an I.Q. of 70; in 1990 Petitioner was found to have an I.Q. of 75; and in 1993 Petitioner was found to have an I.Q. of 73. In addition, Dr. Auble found Petitioner to have an I.Q. of 73 and Dr. Nichols reported that he believed petitioner's I.Q. was likely higher than the assessed score of 73. Thus, the only score reflecting a sub average general intellectual functioning was the 1984 evaluation conducted by the Memphis City School system. However, the school [system's] diagnosis was unspecified mental disorder and conduct disorder, not mental retardation. Thus, it would appear that although the Memphis City School system found Petitioner to have an I.Q. of 70, they did not find that he suffered from deficits in adaptive behavior as specified by the second part of the statutory definition.

. . . .

. . . [T]his Court finds the more reliable evidence regarding Petitioner's intellectual functioning to be the 1990 and 1993 tests, as well as the initial evaluation conducted by Dr. [Auble]. Both the 1990 and 1993 tests indicated Petitioner had a full range I.Q. of 73 or higher. In addition, Dr. Auble's initial report stated that petitioner had an I.Q. of 73, and Dr. Nichols' report stated that he believed the petitioner's I.Q. was even higher. . . . Thus, given the combined testimony of all the experts, this Court finds that Petitioner has failed to meet the first prong of the statutory definition.

. . . Moreover, this Court rejects Dr. Auble's explanation with regard to her re-scoring of Dr. Pendergrass' data. This court simply finds that her explanation for the re-scoring of the data and her interpretation of the statute is not credible.

Therefore, this Court finds Petitioner has failed to demonstrate that he has significant subaverage general intellectual functioning as evidenced by an I.Q. of 70 or below. Thus, it is argued the Petitioner cannot meet the standard set forth by Tenn. Code Ann. 39-13-203 as amended.

-39-

. . . [T]his Court finds that Petitioner has failed to demonstrate that counsel was ineffective in failing to raise the issue of mental retardation either prior to trial or on appeal.

Counsel stated that they believed Petitioner was competent and operating with an I.Q. above the level of individuals who are deemed mentally retarded. Moreover, even if counsel should have raised this issue . . ., in light of the Court's finding that Petitioner is not mentally retarded, Petitioner [has] failed to demonstrate he was prejudiced by trial counsel's inaction.

This court finds that the allegations in sections "III" and "IV" of the amended petition . . . are without merit. These issues have been previously addressed and rejected by the Tennessee Appellate Courts and/or are inappropriate claims for purposes of post-conviction review. Part "II" of the petition addresses alleged error by counsel on direct appeal. However, those issues have either, been addressed and rejected by this Court's review of counsel's trial performance; or Petitioner failed to present proof beyond the mere assertion of error in support of his allegations.

(Footnotes and citations omitted.)

## II. Analysis

### A. Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petition challenging the petitioner's convictions is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or re-evaluate the evidence or substitute its inference for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997), petition to rehear denied, (1998), cert. denied, 525

U.S. 830, 119 S. Ct. 82 (1998)). It is, therefore, the petitioner's burden to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). Id. at 456.

The petitioner contends that this court should not provide a presumption of correctness to the post-conviction court's findings of fact relating to the credibility of Eugene Bowen and James Parker. He argues that the post-conviction court's findings are conclusory in nature and are not supported by the evidence. He further complains that the lower court failed to articulate any valid reason why the testimony of those two witnesses was not credible.

Appellate courts in Tennessee do not reweigh or reevaluate the evidence. We cannot substitute our inferences for those drawn by the trial judge. Moreover, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not this court. Henley, 960 S.W.2d at 579. We will not make credibility determinations.

## B. Petitioner's Claims

### 1. Actual Innocence

The petitioner claims that he is actually innocent of Linda Harris' murder and asks this court to consider his actual innocence as a freestanding claim. He argues that the Tennessee Constitution grants stronger protection of individual rights than does the federal constitution. In this respect, he asserts that "Tennessee case law gives courts the power to fashion a remedy to correct an injustice, including the execution of an innocent man." In this regard, the petitioner asks this court to hold that "executing an innocent person would violate the Tennessee Constitution." According to his appellate brief, "Actual innocence alone requires relief from This Court." The petitioner states that "[he] has a constitutional right not to be executed for a crime he did not commit, and the Post-Conviction Procedure Act guarantees relief when 'a conviction is void or voidable because of an abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Additionally, the petitioner asks this court to adopt the standard that new evidence need only furnish a reasonable basis for concluding that the result of proceedings "might have" been different.

Review of the petitioner's claim is guided by our supreme court's recent ruling in James A. Dellinger v. State, ___ S.W.3d ___, No. E2005-01485-CCA-R3-PD, 2008 Tenn. LEXIS 111 (Knoxville, Feb. 25, 2008). In that case, our supreme court granted the application for permission to appeal to determine whether a freestanding claim of actual innocence was cognizable in an initial petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act. Dellinger asserted that he had a right under the state and federal constitutions not to be imprisoned and executed for a crime he did not commit. The supreme court held that as the Act itself provided an avenue for relief when new scientific evidence of actual innocence became available after the limitations period for filing a post-conviction petition had expired, judicial economy and logic dictated that such evidence should be permitted at the time the original petition was filed. James A. Dellinger, No. E2005-01485-CCA-R3-PD, 2008 Tenn. LEXIS 111, at *___. Although recognizing the existence of a claim of actual innocence based upon new scientific evidence, the supreme court affirmed the denial of relief by concluding that Dellinger failed to meet his burden of proof to support his claim. Id. at *___.

The Tennessee Supreme Court declined the opportunity to address the broader question as to whether a petitioner had a constitutional right not to be executed for a crime he did not commit. Id. at *___. The court acknowledged that the United States Supreme Court had yet to decide the issue of whether the execution of an innocent person violated the federal constitution. Id. at *___ n.4 (citing House v. Bell, 547 U.S. 518, 554-55, 126 S. Ct. 2064 (2006)). Moreover, regarding claims of actual innocence not based on scientific evidence, our supreme court recognized that such claims may be brought in a petition for writ of error coram nobis and in an application for executive clemency. Id. at *___ n.7. Accordingly, our supreme court concluded that a claim of actual innocence not based on scientific evidence may not be raised in a petition for post-conviction relief.

In support of his claim of actual innocence, the petitioner contends that no physical evidence links him to Harris' murder. He alleges that he presented substantial evidence of his innocence at the post-conviction hearing, including the testimony of alibi witness Eugene Bowen and the testimony of James Parker, who overheard Sidney Harris ask a drug dealer to arrange the murder of his wife. The petitioner's claim is not based upon new scientific evidence establishing his actual innocence. A post-conviction proceeding is not the proper avenue in which to seek relief based upon non-scientific evidence establishing actual innocence.

Notwithstanding, even assuming that a claim based on new non-scientific evidence establishing actual innocence is to be recognized in a post-conviction proceeding, the petitioner is not entitled to relief. To establish his "actual innocence," a petitioner must establish by clear and convincing evidence that no jury would have convicted him in light of the new evidence." See Ex parte Elizondo, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (superceded on other grounds by statute); see also Miller v. Comm'r of Corr., 700 A.2d. 1108, 1132 (Conn. 1997) (holding that "in order to grant a petitioner's request for relief, the habeas court first must be convinced by clear and convincing evidence that the petitioner is actually innocent); State ex rel Amrine v. Roper, 102 S.W.3d 541, 548 (Mo. 2003) (en banc) (holding that a petitioner asserting

a freestanding claim of actual innocence is required "to make a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment"); Montoya v. Ulibarri, 163 P.3d 476, 483-86 (N.M. 2007) (stating that petitioner asserting freestanding claim of innocence must convince the court by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence). Considering the "new" evidence introduced at the post-conviction evidentiary hearing, we cannot conclude that the petitioner established by clear and convincing evidence that no jury would have convicted him in light of the new evidence. Thus, even if a freestanding claim of actual innocence was cognizable in a petition for post-conviction relief, we cannot conclude that the petitioner would be entitled to relief on this ground.

## 2. Denied a Fair Post-Conviction Evidentiary Hearing

The petitioner contends that he was denied a fair post-conviction evidentiary hearing because the post-conviction court denied his petition without having the transcribed testimony of Darlene Donald, Linda Harris' sister. The State responds that the petitioner's claim is without merit because due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Matthews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 992 (1976). We conclude that the petitioner is not entitled to relief.

On November 20, 2006, defense counsel received a copy of the transcript of the post-conviction proceedings. Upon review of the transcript, counsel discovered that Donald's testimony had not been transcribed. The testimony was later determined to be "truly missing from the audio tape of the proceedings." Ultimately, a narrative of Donald's testimony was submitted pursuant to Rule 24(c), Tennessee Rules of Appellate Procedure. The petitioner argues that the fact that the post-conviction court rendered its decision knowing an important piece of testimony was missing violates his right to a full and fair hearing. The petitioner further cites to the post-conviction court's failure to mention Donald or other family members related to Linda Harris in its order dismissing the petition.

We conclude that the petitioner is not entitled to relief. The post-conviction court heard Donald's testimony on November 14, 2001. No due process right exists requiring that the trier of fact later read that testimony from a transcript. We are not persuaded that the post-conviction court failed to consider the proof before rendering its decision.

## 3. Mental Retardation

The petitioner contends that "under any standard of proof, [he] is mentally retarded under the provisions of Tenn. Code Ann. § 39-13-203." In support of his argument, he notes that in 1983 to 1984, his full scale I.Q. was 70 and that his school records and additional tests prior to the age of eighteen reflected significantly subaverage general intellectual functioning. Additionally, he notes that his experts and the State's expert, Dr. Nichols, agreed that he met all three prongs of the Tennessee statute exempting the mentally retarded from execution. The

-43-

petitioner complains that the post-conviction court ignored the expert witnesses' unanimous opinions and the weight of the documentary evidence and instead relied upon its own ipse dixit, Latin for "he himself said it." In other words, something that is asserted but unproved. See American Heritage Dictionary 4th ed. (2000). The petitioner makes numerous complaints regarding the court's findings of fact and conclusions of law. He also properly points out that this court's review involves an application of the law to the facts and is de novo. In this regard, the petitioner asserts that (1) the credibility of the witnesses was not an issue in these proceedings; (2) the post-conviction court was not choosing between two permissible views of the evidence because the State failed to present any witnesses or evidence to the contrary; and (3) the judge at the evidentiary hearing was not the judge who presided over the original trial or the original post-conviction proceeding and, therefore, was not in a better position than this court to review the transcripts of the prior proceedings. The petitioner also asserts that the post-conviction court improperly attempted to exercise clinical judgment in finding that he did not have deficits in adaptive behavior and that his subaverage intellectual functioning did not manifest during his developmental period.

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution of mentally retarded individuals. See Tenn. Code Ann. § 39-13-203(b); Howell v. State, 151 S.W.3d 450, 456 (Tenn. 2004); Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001). While our supreme court determined that this legislation was not to be applied retroactively, the court held that the execution of mentally retarded persons violated constitutional prohibitions against cruel and unusual punishment. Id. (citing Van Tran, 66 S.W.3d at 798-99); cf. Atkins v. Virginia, 536 U.S. 304, 321, 122 S. Ct. 2242 (2002) (execution of mentally retarded individuals violates the United States Constitution).

Tennessee Code Annotated section 39-13-203(a) provides the following definition of "mental retardation":

> (1) Significantly sub-average general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The mental retardation must have been manifested during the developmental period or by eighteen (18) years of age.

The demarcation of an I.Q. score of 70 is a bright-line cutoff and must be met. Howell, 151 S.W.3d at 456, 458-59. The statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an I.Q. above 70 could be considered mentally retarded. Id. We note that all three prongs must be satisfied to establish mental retardation.

In post-conviction proceedings, a petitioner must establish mental retardation by a preponderance of the evidence. Howell, 151 S.W.3d at 465. A preponderance of the evidence means evidence which is of greater weight, or is more convincing, than that evidence offered in opposition. 32A C.J.S. Evidence 1312 (2005). "[T]he term does not mean preponderance in amount, but implies an overbalancing in weight, and that it means, in the last analysis, probability of the truth." Id. (internal footnote omitted). Suspicions are insufficient to amount to proof by a preponderance of the evidence. Id. The satisfaction of this preponderance standard requires the finder of fact to evaluate the evidence, determine what evidence is reliable, and determine what evidence is probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty. Id. In other words, a preponderance is such proof as leads the trier of fact to find that it is more probable than not, or more likely than not, that a contested fact exists. Id. A preponderance is attained where the evidence in its quality of credibility destroys and overbalances the equilibrium. Id. Moreover, it is not required that the trier of fact must be entirely or thoroughly satisfied or convinced, or satisfied with clearness and certainty, or that a fact in issue shall be proved to full satisfaction or to the reasonable satisfaction of the trier of fact. Id. "The probabilities must be such that the conclusion is acceptable to the judgment of the court or jury applied to the evidence in the particular case; mere proof of possibility, or possibilities, or even a preponderance of possibilities or a majority of chances, or a choice of probabilities, or among different possibilities, never can suffice alone to establish a proposition of fact." Heck Van Tran v. State, No. W2005-01334-CCA-R3-PD, 2006 Tenn. Crim. App. LEXIS 899, at 60-61, at (Jackson, Nov. 9, 2006), perm. to appeal denied, (Tenn. 2007).

The question of whether a defendant is mentally retarded and, thus, ineligible for the death penalty is a mixed question of law and fact. Id. at *57. Thus, this court must review the post-conviction court's findings of fact de novo, with a presumption of correctness that is to be overcome only when the preponderance of the evidence is contrary to the court's findings. Id.; see also Fields, 40 S.W.3d at 456. In reviewing the application of the law to the facts, however, this court conducts a purely de novo review. Field, 40 S.W.3d at 457. Thus, no presumption of correctness attaches to the post-conviction court's conclusions of law. Id.

The post-conviction court determined that the petitioner did not meet the definition of mentally retarded under section 39-13-203, Tennessee Code Annotated. The post-conviction court found that the petitioner's general intellectual functioning had been evaluated on several occasions throughout his adolescence and adulthood. Specifically, the lower court noted that the petitioner was determined to have an I.Q. of 70 in 1984, an I.Q. of 75 in 1990, and an I.Q. of 73 in 1993. The court also noted that the only score reflecting a subaverage general intellectual functioning was the 1984 evaluation conducted by the Memphis City School system and that the school system's diagnosis was an unspecified mental disorder and conduct disorder, not mental retardation. Thus, the court concluded that although the Memphis City School system found the petitioner to have an I.Q. of 70, the school system apparently did not find that he suffered from deficits in adaptive behavior as specified by the second part of the statutory definition.

The lower court further determined that the 1990 and 1993 tests, which indicated the petitioner had a full range I.Q. of 73 or higher, were more reliable. Accordingly, the lower court

concluded that the petitioner failed to satisfy the first prong of the statutory definition of mental retardation in that he did not have an IQ of 70 or below. The court stated that because the petitioner failed to establish the first prong of the statute, the court did not need to address the second and third prongs of the statute.[3] In our consideration of the post-conviction court's conclusion that the petitioner failed to establish he had subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or below, we will review the proof presented by the petitioner at the evidentiary hearing.

Dr. Pincus observed that the petitioner's brain was abnormal in that "it was shrunken, atrophic, especially in the parietal regions." Dr. Pincus could not say with certainty as to what effect this would have on a person's neurological functioning. In a summary of his findings, Dr. Pincus noted that the petitioner had evidence of neurologic dysfunction and had the reading level of a fifth grader. Dr. Pincus stated, however, that the facts of the petitioner's crime involved planning and there was no indication the petitioner's actions on the night of the homicide were the result of a delusional act.

Dr. Auble testified that the petitioner's school records demonstrated he was functioning one to two levels below his grade level. In 1983, the petitioner was found to have an I.Q. of 82. She reported that in 1984 to 1985, the petitioner was tested by the Memphis City Schools and was found to have an I.Q. of 70. Results of another test in 1985 reflected the petitioner's I.Q. was 70. On cross-examination, Dr. Auble conceded that she diagnosed the petitioner with borderline intellectual functioning and that his I.Q. range was between 71 and 84. She qualified this assessment, stating that "his functional intelligence is 70 or below." Her assessment was based on her interpretation of the Tennessee statute.

Dr. Bishop interviewed the petitioner in 2000 and concluded that his adaptive behavior met the criterion for being mentally retarded. Dr. Bishop stated that the petitioner was given the Vineland Adaptive Behavior Scales in 1987 and that a Vineland test score equated to an I.Q. score with a standard deviation of 15. Two standard deviations below the norm of 100 was the standard for mental retardation. Dr. Bishop related that the petitioner scored a 70 on the test, two standard deviations below the norm. She further stated that the petitioner scored an I.Q. of 70 on the Wechsler Intelligence Scale for Children-Revised. Dr. Bishop related that Dr. Pendergrass had administered the WAIS-3 testing, which indicated the petitioner had an I.Q. of 75. She explained that the rate of error was a little over five points. In her professional opinion, Dr. Bishop concluded that the petitioner had a "significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient of 70 or below."

---

[3]Specifically, the post-conviction court's order states in a footnote as follows: "This court acknowledges the testimony presented regarding petitioner's potential deficits in adaptive behavior and childhood injuries to the brain; however, since this court finds petitioner has failed to meet the first prong of the statute, in that he does not have an I.Q. of seventy or below, this court need not address the second and third prong of the statute."

Dr. Nichols testified that an I.Q. test administered in June 1990 revealed the petitioner had a full scale I.Q. of 73. He stated that in his opinion, the petitioner's intellectual level was actually higher than the I.Q. of 73. Dr. Nichols added that the petitioner's school records indicated tests performed in November 1984 and February 1985 showed a full scale I.Q. of 70. However, in 1985, the petitioner was diagnosed with "unspecified mental disorder, other handicapping conditions, conduct disorder, socialized nonaggressive."

In State v. Strode, 232 S.W.3d 1, 18 (Tenn. 2007), the Tennessee Supreme Court held that the manifestation of the subaverage general intellectual functioning must have been established prior to age eighteen. Subaverage general intellectual functioning is based on Intelligence Quotient ("I.Q.") scores that were obtained through the use of standardized intelligence tests. Van Tran, 66 S.W.3d at 795. The DSM IV used the following scales:

> I.Q. of 50-55 to approximately 70: mild mental retardation
>
> I.Q. of 35-40 to 50-55: moderate mental retardation
>
> I.Q. of 20-25 to 35-40: severe mental retardation [and]
>
> I.Q. below 20-25: profound mental retardation.

Id. at 795 (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 1994)).

Turning to the instant case, in 1984, the thirteen-year-old petitioner had a full scale I.Q. of 70. However, in June 1990, three and one-half years before the crime, the nineteen-year-old petitioner had a full scale I.Q. of 73, and in 1999, five years after the crime, he had a full scale I.Q. of 75. Although, Dr. Auble and Dr. Bishop testified that they believed the petitioner's I.Q. was actually 70 or below, Dr. Auble acknowledged on cross-examination that given the rate of error on the 1990 I.Q. test, the petitioner's I.Q. could have been even higher than the test indicated. Furthermore, Dr. Nichols testified for the State that he believed the petitioner's I.Q. was higher than the 1990 test result of 73. In light of the evidence presented, we cannot conclude that the post-conviction court erred by finding that the petitioner failed to show by a preponderance of the evidence that he satisfied the first prong of the mental retardation definition.

We note, however, that Dr. Auble also testified that all I.Q. tests have a range of error and, therefore, that the petitioner's I.Q. in 1990 could have been as low as 67. Additionally, Dr. Bishop testified that given the rates of error associated with the petitioner's I.Q. tests, he could have scored 70 or below on all of the tests and that the five-point difference between a 70 and a 75 on an I.Q. test . Despite this testimony, as an intermediate court, we are bound by our supreme court's conclusion in Howell, holding that the legislature intended for 70 to be a bright-line cutoff that does not take into account standard rates of error. See Howell, 151 S.W.3d at 459. Unfortunately, by refusing to consider ranges of error, it is our view that some mentally

retarded defendants are likely to be executed in Tennessee, particularly in a case similar to this one where the defendant's I.Q. is so close to the brigh-line cutoff of 70.

4. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 350, 83 S. Ct. 792 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465, 62 S. Ct. 1252 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S. Ct. 1708 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441 (1970); see also Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S. Ct. at 2064; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). The following two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires that a petitioner show that counsel's representation fell below an objective standard of reasonableness, or "outside the range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; see also Kimmelman v. Morrison, 477 U.S. 365, 386, 106 S. Ct. 2574 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, n.38 (1984)). Notwithstanding, it is the duty of this Court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838 (1993) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). That is, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the petitioner of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587. For example, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985); Code v. Montgomery. 799 F.2d 1481, 1483 (11th Cir. 1986). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence satisfies the second prong of Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), cert. denied, 498 U.S. 950, 111 S. Ct. 369 (1990). Moreover, when challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors of counsel, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (citing Strickland, 466 U.S. at 695, 104 S. Ct. at 2069).

a. guilt phase deficiencies

The petitioner contends that he received the ineffective assistance of counsel at the guilt phase of his capital trial. Specifically, he contends that counsel (1) failed to locate and interview critical witnesses, (2) failed to investigate and effectively cross-examine the State's witnesses, (3) failed to present a defense, and (4) failed to request a continuance.

-49-

1. Trial counsel failed to investigate critical witnesses.

The petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to locate and interview two critical witnesses. The two witnesses were Eugene Bowen, an alibi witness, and James Parker, who implicated other suspects. We will address the petitioner's claims as to each witness separately.

Eugene Bowen lived in the same neighborhood as Jackie Cannon in 1993 and 1994. He testified that he used to sell crack cocaine to Cannon and that at times, she would "just [scream]." Bowen also stated that the petitioner lived with Cannon in her LaMoyne Gardens apartment and that he and the petitioner played basketball together on the night of Linda Harris' murder. He said that the petitioner had his little girl with him and that after they finished "shooting ball," he and the petitioner walked to get a beer. Later, he observed the petitioner and "Wham" having an argument. He explained that "Wham" was Cannon. Bowen said the petitioner's attorneys never contacted him.

The post-conviction court concluded that counsel was not deficient by failing to locate, interview, and call Eugene Bowen as an alibi witness because the petitioner failed to inform counsel about Bowen. The post-conviction court further determined that Bowen was not credible. The petitioner contests the post-conviction court's ruling, arguing, in pertinent part, that trial counsel was aware of Bowen but failed to investigate him.

At the post-conviction hearing, lead counsel was questioned as to whether the petitioner had told him about a person named "Frog," whom the petitioner was with on the night of the shooting. Counsel responded, "As I can recall, it doesn't (indiscernible) in the file; and I knew we had that in there with someone. But I think that's the only name we had I believe." Counsel added that no investigation was conducted to find the person known only to the defense as "Frog." However, counsel also said the petitioner could not recall any person, other than Jackie Cannon, who could help him with his alibi defense. Counsel further stated that "I just don't recall anybody else that he said that he may have been with. It's a possibility that he had; but if he had, there would have been an investigation done on it."

The petitioner also contends that trial counsel was ineffective for failing to locate and interview James Parker. He adds that counsel could have located Parker with reasonable effort but failed to do so. He argues that he was prejudiced by counsel's failure to interview Parker because it prevented him from presenting other suspects to the jury.

At the post-conviction hearing, lead counsel stated that prior to trial, he was in possession of Parker's statement, which indicated that Parker had overheard three men discussing the fact that Sidney Harris hired them to kill Linda Harris. Trial counsel asked the investigator to locate Parker, but the investigator did not find him. In addition, counsel was concerned that in light of Sidney Harris' injuries, introducing Parker's unsupported allegations into evidence might inflame

-50-

the jury. Sergeant McWilliams testified that an investigation was conducted into Sidney Harris' involvement in his wife's murder but that no motive was found. An investigation into Parker's statement also was conducted, and the police did not uncover any information to corroborate Parker's statement.

The post-conviction court determined that trial counsel made a strategic decision not to call Parker to testify. In addition, the court did not give great weight to Parker's credibility. Specifically, the lower court stated,

> Counsel's decision to not call James Parker as a witness, during the guilt phase . . . , is equally attributable to strategy. Again, this Court will not second guess trial counsel's strategy unless it falls below the acceptable standards. . . . [T]his Court does not give great weight to the credibility of Parker. Essentially, counsel would have been pitting the credibility of Parker against that of Harris, who himself, had been injured in the attack. . . . Sgt. McWilliams testified that he followed up on the information provided by Parker, but found no link to the murder. . . . McWilliams further stated that there was no credible evidence that someone else was involved in the murder.

We conclude that the petitioner has failed to demonstrate that counsel rendered deficient performance or that he was prejudiced by counsel's actions. The testimony at the post-conviction hearing revealed that Parker could not be located. Furthermore, even if Parker had been found, counsel made the tactical decision not to pursue Parker's uncorroborated allegations at the guilt phase. Finally, the post-conviction court concluded that Parker lacked credibility. Therefore, counsel was not ineffective for failing to investigate further and present Parker's testimony.

2. Trial counsel failed to investigate and cross-examine the State's witnesses effectively.

Next, the petitioner argues that his defense team knew the State was going to call two key witnesses, Sidney Harris and Jackie Cannon, to testify. However, defense counsel completely failed to investigate the two witnesses and failed to cross-examine them effectively.

Regarding Sidney Harris, the petitioner contends that his attorneys failed to investigate Sidney adequately when they had information implicating him in his wife's murder. Specifically, the petitioner cites James Parker's statement. He also cites to the statement Al Harris, Sidney's brother, gave to police, saying he was not sure Sidney was telling the police everything about his wife's murder. The petitioner further cites to counsel's statement that it was common knowledge Sidney engaged in extramarital affairs.

The post-conviction court determined as follows:

> Petitioner's claims center around the defense theory that Sidney Harris was involved in his wife's murder. . . . Petitioner challenges trial counsel's performance with regard to his cross-examination of Harris.
>
> . . . .
>
> With regard to the cross-examination of Harris . . . , this Court finds counsel's performance was not deficient. . . . [T]rial counsel specifically stated that he was concerned that a defense which [attacked] Harris would result in backlash from the jury directly to the Petitioner. This Court finds such decisions to be reasonable tactical maneuvers made by informed and adequately prepared counsel. Additionally, as the Supreme Court noted on direct appeal, Harris testified at trial that he was injured in the attack and was heavily sedated when he first spoke to police. . . . Thus, although it appears counsel attempted to exploit certain discrepancies, the jury accepted Harris' explanation.

The petitioner's claims regarding Sidney's involvement in his wife's murder, involvement with illegal drugs, involvement in extramarital affairs, and financial problems are based on hearsay statements from numerous witnesses. Sergeant McWilliams testified that the Memphis Police Department explored Sidney's possible involvement in the murder but that the investigation could not corroborate any allegations. Lead counsel stated that Sidney was interviewed and that his brother also may have been interviewed. The petitioner has failed to offer legitimate evidence to support his claims regarding Sidney's character. The post-conviction court determined that in light of Sidney's injuries, trial counsel made a sound tactical decision not to explore those areas in a hostile cross-examination. We cannot disagree. Therefore, the petitioner has failed to establish prejudice and is not entitled to relief on this issue.

As to Jackie Cannon, the petitioner contends that trial counsel was ineffective for failing to investigate her. He asserts that defense counsel knew she was "possibly on drugs" and that she received money in exchange for giving information to the police. The petitioner argues that had defense counsel completed an adequate investigation of Cannon, they would have learned that she had been seriously addicted to crack cocaine for many years and that her drug abuse masked an underlying mental condition. The petitioner asserts that Cannon's drug use and bizarre behavior would have undermined the veracity of her statement implicating him as the perpetrator.

At the post-conviction hearing, lead counsel testified that, in his opinion, Cannon was "possibly on drugs." However, he also was aware that the petitioner had injured Cannon during a physical altercation. Sergeant McWilliams stated that nothing indicated Cannon was using crack cocaine and that Cannon was "very scared."

-52-

The post-conviction court reached the following conclusions:

> First, Petitioner asserts trial counsel's pre-trial investigation of Jackie Cannon should have included a request for production of Cannon's mental health and juvenile records. He claims Cannon has a history of mental health problems and drug abuse. Thus, Petitioner also contends trial counsel should have requested a psychiatric examination of Cannon prior to her testifying at trial.
>
> . . . .
>
> . . . Cannon either refused to answer their questions or continued to assert that her trial testimony was truthful. . . . When asked if she had given two separate affidavits contradicting or recanting portions of her trial testimony, Cannon specifically denied having given the statements or signing the affidavits. One fact upon which Cannon vehemently insisted was that the petitioner "attempted" to "murder" her in order to prevent her from going to the police.
>
> With regard to Petitioner's allegations that counsel should have obtained Cannon's medical and juvenile records . . . , the Petitioner offered no evidence to show trial counsel should have been aware of Cannon's problems. In fact, during the trial, the Petitioner, who lived with the witness at the time of the murder, provided counsel with no information regarding any present or past mental health or drug problems the witness may have suffered from at the time of her trial testimony. Other than Cannon, who was likely not forthcoming about such details, the Petitioner was the best source for such information. It was up to the Petitioner to alert counsel that there may be some mental health issues relating to Cannon's testimony. Every witness will not be investigated for mental health issues unless pertinent information is discovered by counsel which related directly to the case.
>
> Therefore, Petitioner cannot now claim ineffective assistance of counsel because he chose to remain silent about certain mental health issues. . . . [T]he Petitioner was unable to show that, when Cannon testified at trial, she actually suffered from mental illness or was under the influence of drugs. Thus, this Court is not inclined to find trial counsel was ineffective in failing to request Cannon's mental and juvenile records.

The petitioner has failed to convince this court that any information was available to trial counsel which would have indicated Cannon suffered from a mental defect at the time of the trial. While some witnesses provided insight into Cannon's unusual behavior, this alone was insufficient to require defense counsel to request any possible mental health records on the State's witness. Additionally, while trial counsel conceded that he thought Cannon was using illegal drugs, Sergeant McWilliams testified to the contrary, stating that nothing indicated she was using drugs. There is no indication, and it is highly unlikely, that Cannon would have admitted to drug use at the trial. This court will not assume that Cannon would have admitted drug use on the stand, as such an assumption is highly improbable. Moreover, the testimony of the various witnesses who stated that Cannon had used cocaine most likely would have been deemed inadmissible by the trial court. Therefore, we cannot conclude that the petitioner was prejudiced by trial counsel's decision not to cross-examine Cannon on these issues.

3. Trial counsel failed to present a defense.

The petitioner asserts that trial counsel's failure to investigate James Parker's statement and failure to investigate Sidney Harris deprived him from presenting the defense that Sidney Harris was involved in his wife's murder. The petitioner argues that his alibi witness, the lack of any physical evidence linking him to the crime, the fact that the gun was never found, and the fact that a second gunman was never arrested would have bolstered his defense. The petitioner argues that Sidney Harris' identification of him was unreliable and that Jackie Cannon's statement to the police was both false and unreliable.

Trial counsel unsuccessfully challenged Sidney Harris' identification of the petitioner in a motion to suppress. Moreover, counsel attempted to discredit the identification during the trial. There is no support in the record, beyond innuendo, that Sidney Harris was responsible for his wife's murder. Sergeant McWilliams testified that a police investigation did not result in Sidney Harris becoming a suspect. Additionally, Edward Bowen's testimony at the post-conviction hearing fell short of establishing an alibi, and the post-conviction court was concerned about Bowen's credibility. Trial counsel, considering the options available, determined that an attack on an injured victim who had just lost his wife could backfire if presented to a jury. The post-conviction court properly declined to second-guess trial counsel's trial strategy. Accordingly, the petitioner is not entitled to relief on this issue.

4. Trial counsel failed to request a continuance.

One week before trial, the petitioner learned that Ed Thompson, lead counsel at the time, was ill and, therefore, that the trial might not begin as scheduled. Ultimately, Thompson was unable to appear at trial, and new lead counsel, who had been lead counsel for only one week, proceeded to trial. The petitioner contends that this was insufficient time for him and lead counsel to develop a relationship and that counsel should have requested a continuance in order to establish a relationship with him and investigate the case.

At the post-conviction hearing, lead counsel testified that he initially was appointed as second chair counsel and that he handled most of the motion hearings, including the motion to suppress and the Morgan hearing. He also stated that he became lead counsel in September 1994 and that, according to his notes, Ed Thompson had planned to try the petitioner's case as late as November 7, 1994. The petitioner's trial started on November 14, 1994.

Although the petitioner asserts that counsel was deficient for failing to request a continuance for the purpose of "establish[ing] a relationship with Mr. Cribbs or to investigate his case," the proof shows that lead counsel was involved with the case well before November 7, 1994. He had met with the petitioner and was familiar with the facts of the case. Nothing suggests that counsel did not have a reasonable time to prepare prior to trial. Moreover, the petitioner has failed to show how he was prejudiced by counsel's failure to establish a better relationship with him. The petitioner is not entitled to relief on this issue.

b. penalty phase deficiencies

The petitioner also complains about trial counsel's performance during the penalty phase of his capital trial. Specifically, he contends that counsel (1) failed to investigate properly and prepare mitigation evidence and (2) failed to introduce any evidence of residual doubt or argue residual doubt during closing argument.

1. Trial counsel failed to investigate and prepare mitigation evidence.

The petitioner contends that trial counsel failed to investigate and present mitigation evidence regarding his family history. Additionally, he contends that counsel should have discovered and presented evidence that he was intellectually impaired.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S. Ct. 2658, 2666 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S. Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982). "'[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting Brown, 479 U.S. at 545, 107 S. Ct. at 841) (O'Connor, J., concurring)).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly decided not to offer any evidence at the penalty phase. Id. at 421; see also State v. Zagorski, 701 S.W.2d 808 (Tenn.

1985). Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 691, 104 S. Ct. at 2052. Counsel's duty to investigate derives from counsel's basic function which is "to make the adversarial testing process work in the particular case." Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 2066 (1986). The adversarial testing process will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies. In this regard, counsel is under a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. Id. at 384, 106 S. Ct. at 2066.

In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. Wiggins v. Smith, 539 U.S. 523, 123 S. Ct. 2536 (2003). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Id. at 533, 121 S. Ct. at 2381. Neither is counsel required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigation evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbit v. Calderson, 151 F.3d 1170, 1174 (9th Cir. 1998). A tactical decision not to pursue one course or another should not be confused with the duty to investigate. In summary,

> no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477, 120 S. Ct. 1029, 1034-35 (2000) (internal citations and quotations omitted).

In addressing attorney performance, courts must be mindful not "to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579 (quoting Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). A court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation."

Goad, 938 S.W.2d at 369.  On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Id.

In now familiar language, the Supreme Court in Strickland linked the deference afforded counsel's choices and decisions to the reasonableness of the investigation supporting the choices and decisions, stating as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Cauthern v. State, 145 S.W.3d 571, 600-01 (Tenn. Crim. App. 2004) (citing Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066).

A reasonable investigation does not require that counsel leave no stone unturned.  The reviewing court must consider the limited time and resources of counsel.  Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources.  Additionally,

> the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . .  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see also Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

The post-conviction court found as follows:

> Initially, this Court finds that, at best, there is conflicting testimony regarding whether or not the Petitioner's family would have participated in the sentencing phase of the trial. . . .  This Court accredits the testimony of trial counsel who stated that the defense team attempted to contact the Petitioner's family members but were told not to call back.  Additionally, this Court finds trial counsel was not negligent in failing to call James Parker to support

-57-

a theory of residual doubt and attack the victim's husband. Trial counsel testified that they attempted to ascertain the veracity of Parker's claims, but were unable to do so. In his statement to police and again at the post-conviction hearing, Parker stated that he did not know the actual names of the persons he claimed Sidney Harris hired to kill his wife. He further stated that he had no personal knowledge of the events surrounding Linda Harris' murder. . . . [T]he Court finds Parker's testimony . . . would have added very little to Petitioner's mitigation. Thus, this Court finds defense counsel's performance was not deficient due to their failure to be present at the sentencing phase. Also, the testimony of each of the Petitioner's family members and testimony of James Parker does not impact trial counsel's performance in such a manner that prejudices Petitioner and the result of the case.

Moreover, even if this Court were to find counsel's performance at the sentencing phase to be deficient, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to call certain witnesses on his behalf. Trial counsel . . . testifie[d] that certain witnesses did not want to testify.

. . . Trial counsel testified that the defense team attempted to contact the witnesses[;] however, Petitioner's family rebuffed their attempts. Moreover, despite the lack of testimony . . . Petitioner testified during the sentencing phase of trial; and, thus, had an opportunity to discuss his background in detail. Thus, it was not as if defense counsel failed to put on any mitigation proof. . . . Finally, the State presented indisputable evidence of two [enhancement] factors: (1) that the murder was committed in the perpetration of a burglary; and (2) that the defendant had been convicted of one or more prior violent felonies. Thus, . . . this Court finds that, even if counsel's performance was deficient, the Petitioner has failed to demonstrate he was prejudiced by counsel's alleged inaction.

a. family history

The petitioner claims that trial counsel was ineffective for failing to investigate and present mitigation evidence about his family history. There is conflicting testimony as to whether the petitioner's family members would have participated in the sentencing phase. According to our supreme court's opinion in the petitioner's direct appeal, the petitioner testified at his sentencing hearing that "none of his family were able to attend his trial." Cribbs, 967 S.W.2d at 778. Furthermore, "he had told his aunt that the trial was a matter of life or death, but

he had not pressed his mother to attend the trial because she had been ill, and he did not want to worry her." Id. Those statements are consistent with testimony at the post-conviction hearing. Co-counsel testified that she recalled "there not being somebody available to testify on his behalf" and that "for some reason . . . we couldn't get his family to come down for the mitigation." Lead counsel testified that other members of the defense team interviewed family members who lived in Memphis and that just prior to trial, the petitioner's uncle, Charlie Cribbs, told the defense not to call them anymore. The post-conviction court accredited the testimony of trial counsel, which was corroborated by the petitioner's trial testimony. Based upon the testimony provided by the petitioner's family members at the post-conviction hearing, we also are unable to conclude that the sentence would not have been the same. Henley, 960 S.W.2d at 579-80. Therefore, the petitioner is not entitled to relief on this issue.

b. intellectual impairment

The petitioner contends that counsel should have discovered and presented evidence that he was intellectually impaired. In support of his claim, he notes that Elizabeth Benson's intake form noted he had been in resource classes in school and that the defense team did not obtain his records from the Memphis City Schools and Geeter High School.

Counsel has a duty to investigate all reasonable lines of defense, and this duty is most strictly observed in capital cases. For counsel to be ineffective for failing to investigate an alleged mental condition, the petitioner must show facts indicating a possible mental condition. Sometimes it will be apparent from the evidence surrounding the circumstances of the crime, from conversations with the defendant, or from other sources of information not requiring fresh investigation that the petitioner has some mental or other condition that will require further investigation; then, the failure to investigate will be ineffective assistance. See Antwine v. Delo, 54 F.3d 1357, 1365-68 (8th Cir. 1995), cert. denied, 516 U.S. 1067, 116 S. Ct. 753 (1996); Brewer v. Aiken, 935 F.2d 850, 857-58 (7th Cir. 1991). In Thompson v. State, 958 S.W.2d 156, 164-65 (Tenn. Crim. App. 1997), this court explained as follows:

> "[T]here is a 'greater duty of inquiry into [a] client's mental health imposed for [the] penalty phase of [a capital] trial.'" Cooper v. State, 847 S.W.2d 521, 529 (Tenn. Crim. App. 1992) (quoting Bertolotti v. Dugger, 883 F.2d 1503, 1516 (11th Cir. 1989)) (second and third alterations in original). Even if a psychologically based defense could not be supported at the guilt phase, the evidence may be useful in mitigation at the sentencing phase. Id. Even when court-ordered examinations result in a finding of sanity, defense counsel should always attempt to determine whether psychological infirmities may be used as mitigating evidence. Id.

As stated previously, Tennessee Code Annotated section 39-13-203 prohibits the execution of mentally retarded individuals. See Tenn. Code Ann. § 39-13-203(b); Howell, 151 S.W.3d at 456. A person is "mentally retarded" when the person (1) has an I.Q. of 70 or below,

(2) has deficits in adaptive behavior, and (3) the mental retardation manifested during the person's developmental period or by the time the person turned eighteen years old. Tenn. Code. Ann. § 39-13-203(a). The trial court determines whether a defendant was mentally retarded at the time of the crime, and the burden is on the defendant to prove mental retardation by a preponderance of the evidence. Tenn. Code. Ann. § 39-13-203(a); Howell, 151 S.W.3d at 465. If the defendant raises the issue of mental retardation at trial but the court determines that the defendant was not mentally retarded, then "the defendant shall be entitled to offer evidence to the trier of fact of diminished intellectual capacity as a mitigating circumstance pursuant to § 39-13-204(j)(8)." Tenn. Code. Ann. § 39-13-203(e). For defendants convicted before the enactment of the statute, a claim of mental retardation should be raised in a petition for post-conviction relief. Van Tran, 66 S.W.3d at 811-12.

In determining whether trial counsel was ineffective for failing to investigate and present certain mitigating evidence, our supreme court has outlined several factors to consider in making such an evaluation. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available and not presented. Goad, 938 S.W.2d at 371. Second, the court must determine whether substantially similar mitigating evidence was presented to the jury during either the guilt or penalty phase of the proceedings. Id. Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id.

At the post-conviction hearing, co-counsel testified that Elizabeth Benson had reported the petitioner was in a resource class. Co-counsel interpreted a "resource class" to mean a class for those persons "who were a little bit slower than everybody else so they were in special ed. classes." Co-counsel said that she did not remember reviewing any of the petitioner's birth, school, or juvenile records and that he never indicated he was having emotional or mental problems. Co-counsel also stated that nothing indicated the petitioner did not understand the nature of the charges against him, the legal proceedings, or the law and evidence against him and that if she had noticed any mental problem, she would not have ignored it.

Similarly, lead counsel testified that he was aware the petitioner had some type of learning disability but that the defense did not further investigate his mental condition. Instead, the investigation was limited to an evaluation conducted by the Midtown Mental Health Center. Although there was some discussion as to whether the defense should retain mental health experts, lead counsel determined they were not necessary. In addition, lead counsel testified that he did not have any difficulty conversing with the petitioner and that the petitioner understood the legal process, the crime he was charged with, the facts against him, and the law establishing punishment. As did co-counsel, lead counsel stated that if he had had any concerns about the petitioner's ability to understand, he would have had further evaluations conducted. Furthermore, lead counsel stated that although the petitioner's school records were requested, the defense never received them.

Although the petitioner's attorneys were aware that he had some type of mental impairment, they failed to pursue any further investigation into the issue. Considering the severity of the charges and the possible punishment in this case and the fact that trial counsel was aware the petitioner was mentally impaired, counsel had a duty to collect as much information as possible about the petitioner's mental history, including his school records. Had counsel followed through with their request for the petitioner's records from the Memphis City School system, they would have discovered that the results of an I.Q. test the petitioner took when he was thirteen years old showed his I.Q. was only 70, the threshhold delineating mental retardation and ineligibility for the death penalty. The defense then could have raised the issue regarding mental retardation in the trial court. Moreover, although the post-conviction court stated that it would not have found the petitioner to be mentally retarded, counsel could have argued to the jury in mitigation at sentencing that the petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct "to the requirements of the law was substantially impaired as a result of a mental disease or defect . . . which was insufficient to establish a defense to the crime but which substantially affected the [petitioner's] judgment." Tenn. Code Ann. § 39-13-204(j)(8). Instead, counsel failed to present any evidence at sentencing regarding the petitioner's mental condition. Counsel's inadequate investigation resulted in the failure to discover the evidence and was deficient performance.

Furthermore, by failing to investigate the petitioner's mental impairment, defense counsel precluded the jury from considering the information. This evidence would have been essential in attempting to show mitigating circumstances, and counsel's failure to present evidence about the petitioner's mental deficits rendered the sentencing phase of the petitioner's trial fundamentally unfair. Therefore, we are unable to conclude that the petitioner was not prejudiced by trial counsel's failure to explore his mental impairment. The petitioner has satisfied both prongs of the Strickland test and received the ineffective assistance of counsel.

2. Trial counsel failed to introduce any evidence of residual doubt.

The petitioner contends that trial counsel failed to present any evidence of residual doubt during the penalty phase. Specifically, he argues that trial counsel should have presented the testimony of James Parker and the family and friends of Linda Harris to cast doubt on his guilt and that counsel should have presented proof regarding Sidney Harris' motives to have his wife killed. The petitioner also faults counsel for failing to argue residual doubt during closing argument. He contends that, although counsel mentioned residual doubt during the opening statement, he failed to mention it during closing argument.

Our supreme court has consistently ruled that proof of residual doubt is relevant in a capital sentencing hearing as a "non-statutory mitigating circumstance." State v. Rimmer, 250 S.W.3d 12, 23 (Tenn. 2008) (citing State v. Austin, 87 S.W.3d 447, 459 (Tenn. 2002); State v. Hartman, 42 S.W.3d 44, 55 (Tenn. 2001)). During the penalty phase, the petitioner testified that he was innocent of Linda Harris' murder. He explained that he and Jackie Cannon had aruged

over money, that he had "whooped her real bad," and that Cannon had falsely implicated him because she was angry.

The petitioner was able to advance his theory during the penalty phase. If counsel had presented additional testimony, it would have been cumulative to the petitioner's testimony. Furthermore, the State could have rebutted Parker's statement with Sergeant McWilliams' testimony that the police were unable to corroborate Parker's allegations. We are unable to conclude that the petitioner was prejudiced by counsel's failure to put additional residual doubt evidence before the jury or that was he prejudiced by counsel's failure to argue residual doubt during closing argument.

### c. appellate deficiencies

The petitioner raises several arguments regarding appellate counsel's performance on direct appeal. Although not specifically delineated in his argument, he essentially argues that he received the ineffective assistance of counsel because appellate counsel (1) failed to raise the issue of his actual innocence; (2) failed to raise the issue of his mental retardation; and (3) failed to raise any issue regarding trial counsel's deficient performance.[4] The State argues that the petitioner has waived any challenge to appellate counsel's performance because he failed to offer any argument to support his allegations. See Tenn. Ct. Crim. App. R 10(b). In the alternative, the State asserts that because the individual claims fail on their merits, the petitioner cannot establish prejudice.

To determine whether appellate counsel was constitutionally effective, we use the two-prong test set forth in Strickland, the same test applied to claims of ineffective assistance of trial counsel asserted under the Sixth Amendment to the United States Constitution. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004); Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995); see also Smith v. Murray, 477 U.S. 527, 535-36, 106 S. Ct. 2661 (1986) (applying Strickland to a claim of attorney error on appeal). As stated previously, under Strickland, we must determine (1) whether counsel's performance was deficient and (2) whether the petitioner was prejudiced by the alleged deficiency. 466 U.S. at 687, 104 S. Ct. 2052. The petitioner bears the burden of establishing both prongs of this test. Id. at 690-94, 104 S. Ct. 2052. Failure to establish either prong provides a sufficient basis to deny relief. Id. at 697, 104 S. Ct. 2052. Accordingly, a court need not address both prongs if the petitioner makes an insufficient showing of one component. Id.

---

[4] The petitioner merely refers this court to the claims set forth in his issues numbered I through VII. The petitioner's claims attached to his issues numbered III (post-conviction court credibility determinations should not be given deference by this court) and IV (post-conviction court rendered decision without full transcript of post-conviction hearing) cannot logically be attached to any deficient performance on behalf of appellate counsel. Obviously, those alleged errors had not even occurred at the time of the direct appeal. The petitioner's assertion that alleged errors should be attributed to counsel are not well taken.

We acknowledge that appellate counsel are not constitutionally required to raise every conceivable issue on appeal. King v. State, 989 S.W.2d 319, 334 (Tenn. 1999); Campbell v. State, 904 S.W.2d 594, 596-97 (Tenn. 1995). The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Jones v. Barnes, 463 U.S. 745, 751, 103 S. Ct. 3308 (1983); Carpenter, 126 S.W.3d at 886; King, 989 S.W.2d at 334. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference. See Campbell, 904 S.W.2d at 597; see also Strickland, 466 U.S. at 689, 104 S. Ct. 2052. We should not second-guess such decisions. Deference to counsel's tactical choices, however, applies only if such choices are within the range of competence required of attorneys in criminal cases. Carpenter, 126 S.W.3d at 887; Campbell, 904 S.W.2d at 597.

On appeal to this court, appellate counsel raised the following issues:

(1) whether the eyewitness jury instructions were adequate;

(2) whether the crime scene video was unfairly prejudicial;

(3) whether the photographic lineup was unduly suggestive;

(4) whether references to the Bible, victim impact, parole eligibility, and mitigation during final argument qualified as prosecutorial misconduct;

(5) whether the state may use prior convictions for attempted second degree murder to establish the prior violent felonies aggravator;

(6) whether the denial of specially requested instructions were erroneous;

(7) whether the Tennessee death penalty statute violates the state or federal constitutions;

(8) whether the presentation of evidence of a nonviolent felony to establish the prior violent felonies aggravator requires reversal of the death sentence; . . .

(9) whether use of the underlying felony for this felony murder could be used as an aggravating circumstance under the state constitutional standard as defined in State v. Middlebrooks . . . [; and]

[(10 whether the evidence was sufficient.]

State v. Perry A. Cribbs, No. 02C01-9507-CR-00211, 1997 Tenn. Crim. App. LEXIS 142, at **2-3 (Jackson, Feb. 14, 1997), affirmed by, 967 S.W.2d 773 (Tenn. 1998). The petitioner failed

to present any proof at the post-conviction hearing related to his claims that appellate counsel were deficient.

We acknowledge that appeals are limited to a review of evidence presented in the trial court. Nothing permits appellate counsel's introduction of new evidence at the appellate level. Indeed, appellate courts are not fact-finding courts. In this regard, the petitioner's claim of error by appellate counsel for failing to raise a claim of actual innocence is unfounded. There is no avenue by which counsel could have introduced new evidence. Appellate counsel challenged the sufficiency of the evidence but were unsuccessful. There existed no avenue on direct appeal under which counsel could have validly raised a claim of actual innocence. This reasoning applies equally to the petitioner's claim that appellate counsel failed to raise the issue of his mental retardation. Nothing in the trial record was available to appellate counsel upon which to base such a challenge.

Finally, this court has repeatedly cautioned that raising an issue of ineffective assistance of counsel on direct appeal is a practice to be avoided due to the difficulty in proving an ineffective assistance of counsel claim without an evidentiary hearing and the danger that the defendant will not only lose on direct appeal, but also be barred from raising the issue in a later post-conviction petition. See Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999); Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). Accordingly, we cannot conclude that appellate counsel's decision not to challenge the effectiveness of trial counsel was not a tactical decision based upon well reasoned decision. Accordingly, the petitioner has failed to establish that appellate counsel were deficient in their performance and/or that he was prejudiced by alleged errors committed by appellate counsel. The petitioner has failed to show that he is entitled to relief on this claim.

### d. cumulative deficiencies

The petitioner contends that counsel's performance was constitutionally deficient based upon the cumulative effect of the errors. Because this court has determined that trial counsel was ineffective for failing to investigate and present evidence of the petitioner's mental impairments at his capital sentencing hearing, we need not address the impact of cumulative deficiencies.

### 5. Constitutionality of the Death Penalty in Tennessee

The petitioner raises numerous challenges to the constitutionality of the imposition of the death penalty. In essence, he asserts that his death sentence must be vacated because the trial and appellate proceedings were "rife" with constitutional error. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, the petitioner's claims are waived. See Tenn. Code Ann. § 40-30-106(g). The petitioner concedes that many of his claims were ruled upon in the opinion on direct appeal but argues that he is compelled to preserve all issues for later possible federal review. In this regard, we note that the following claims have

previously been reviewed and rejected on direct appeal and are not appropriate for this court's review at this stage:

a.    The petitioner claims that Tennessee's death penalty statutes fail to meaningfully narrow the class of death-eligible defendants, specifically because Tennessee Code Annotated section 39-13-204(i)(2), (5), (6), and (7) are overbroad, vague, and encompass a majority of the homicides committed in Tennessee.  These arguments have been rejected by our supreme court. See State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

b.    The petitioner claims that the death sentence is imposed capriciously and arbitrarily in that

(1)  unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty.  This argument has been rejected.  See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1998).

(2)   The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender.  This argument has been rejected.  See Hines, 919 S.W.2d at 582; State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 23 (Tenn.), cert. denied, 510 U.S. 996, 114 S. Ct. 561 (1993).

(3)  There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter.  This argument has been rejected.  See State v. Caughron, 855 S.W.2d 526, 542 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475 (1993).

(4)   The death qualification process skews the make-up of the jury and results in a relatively prosecution-prone, guilt-prone jury.  This argument has been rejected.  See State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986).

(5)   Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus the cost of execution, deterrence, method of execution.  This argument has been rejected.  See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991).

(6)   The jury is instructed that it must agree unanimously in order to impose a life sentence and is prohibited from being told the effect of a non-unanimous verdict.  This argument has been rejected.  See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23.

(7)  Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227 (1990).  This argument has been rejected.  See Brimmer, 876 S.W.2d at 87; State v.

Thompson, 768 S.W.2d 239, 250 (Tenn. 1989); State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), superseded by statute as recognized by, State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994).

(8)  The jury is not required to make the ultimate determination that death is the appropriate penalty.  This argument has been rejected.  See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(9)  The defendant is denied final closing argument in the penalty phase of the trial.  This argument has been rejected.  See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

(10)  The petitioner contends that the mandatory introduction of victim impact evidence violates the doctrine of separation of powers.  He further alleges that the fact that damaged, depressed, and mentally ill defendants are allowed to waive presentation of available mitigation deprives the jury of essential information in determining whether someone should live or die.  The petitioner's claims regarding the waiver of mitigation proof is irrelevant to his case because the petitioner presented mitigating evidence during the penalty phase.  Moreover, these claims have previously been rejected by the courts of this state.  See  State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005) (appendix); State v. Odom, 137 S.W.3d 572, 602 (Tenn. 2004).

c.  The petitioner argues that the appellate review process in death penalty cases is constitutionally inadequate in its application.  He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed.  This argument has been specifically rejected by our supreme court on numerous occasions.  See Cazes, 875 S.W.2d at 270-71; see also State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992); State v. Barber, 753 S.W.2d 659, 664 (Tenn. 1988). Moreover, the supreme court has recently held that "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."  State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997).

d.  The petitioner asserts that execution by the means of lethal injection violates his rights to be free from cruel and unusual punishment.  The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with contemporary standards of decency and with the overwhelming majority of lethal injection protocols used by other states and the federal government.  Abdul' Rahman v. Bredesen, 181 S.W.3d 292, 306-07 (Tenn. 2005), cert. denied, 547 U.S. 1147, 126 S. Ct. 2288 (2006).  On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol used in Kentucky's lethal injection procedure.  Baze v. Rees, ___ U.S. ___, 128 S. Ct. 1520 (2008). Tennessee uses the same protocol as Kentucky.  Id. (citing Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007)).  The petitioner is not entitled to relief on this issue.

e.  The petitioner asserts that the death sentence infringes upon his fundamental right to life and is not necessary to promote any compelling state interest.  This complaint is contrary to settled precedent as reflected in Cauthern, 145 S.W.3d at 629 (citing Nichols, 90 S.W.3d at 604; State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)).  Accordingly, the petitioner is not entitled to relief on this issue.

f.  The petitioner asserts that Tennessee's imposition of a death penalty violates treaties of the United States and, hence, the federal constitution's Supremacy Clause.  It appears that the petitioner contends the Supremacy Clause was violated when the petitioner's rights under treaties and customary international law to which the United States is bound were disregarded.  Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts.  See Odom, 137 S.W.3d at 600.  We discern no viable reason to resolve this issue in a different manner in this case.  The petitioner is not entitled to relief on this issue.

### III.  Conclusion

After a thorough review of the record, we conclude that trial counsel's failure to conduct adequate investigation into the petitioner's mental impairments and present mitigating evidence at sentencing regarding those impairments suffices for a showing of deficient performance.  Moreover, counsel's constitutionally deficient performance prejudiced the petitioner's right to a fair penalty proceeding.  In our view, there is a reasonable probability that absent the deficiencies, the outcome of the penalty phase of the trial might well have been different.  Therefore, the evidence preponderates against the findings of the post-conviction court, and the petitioner's sentence of death is reversed.  The case is remanded to the trial court for a new sentencing hearing.  However, the judge who presided over this post-conviction proceeding is disqualified from any subsequent proceedings in this case.  With regard to the guilt phase of the trial, the judgment of the post-conviction court is affirmed.

NORMA McGEE OGLE, JUDGE